UNITED STATES DISTRICT COURT

CASE NO.

PAUL MARCUS and DEANE MARCUS,

     Plaintiffs,

vs.

M.S.L. PROPERTY MANAGEMENT,
INC. a Florida corporation.

     Defendant.

_____/

**05-61750**

CIV-

MAGISTRATE JUDGE

## COMPLAINT

Plaintiffs, Paul Marcus and Deane Marcus (together "the Marcuses"), hereby sue

defendant M.S.L. Property Management, Inc. ("MSL") for declaratory relief. The lawsuit

involves a Florida limited partnership in which the Marcuses are limited partners and MSL is the

general partner, and which partnership owns an apartment building in South Florida with a

minimum value of $42,000,000 and possibly more than $44,000,000. As set forth more fully

below, the Marcuses seek orders granting them access to partnership records to which they have

a clear right, and declaring their rights under the terms of their partnership agreement. The

Marcuses will be seeking emergency and expedited relief.

## THE PARTIES

1.     Plaintiff, Paul Marcus, is a citizen of the State of New Hampshire.

2.     Plaintiff, Deane Marcus, is a citizen of the State of New York.

3.     The Marcuses are individual limited partners in Harbor Inn of CS Associates,

Ltd., a Florida limited partnership ("Harbor Inn"), that owns a residential apartment building in

Coral Springs, Florida (the "Property").

1

4.    Paul Marcus owns 59.6% of the Harbor Inn partnership shares, and is by far the

5.    Deane Marcus owns 4.95% of the Harbor Inn partnership shares.

6.    Defendant, MSL, is a Florida corporation whose principal place of business is in Coral Springs, Florida.  At all times material hereto, MSL was the General Partner and Property Manager for Harbor Inn.  Its principals are Murray and Sheldon Liebowitz, who are also limited partners of Harbor Inn.

7.    As the General Partner of Harbor Inn, MSL owns 1% of the Harbor Inn partnership shares.

8.    Murray Liebowitz owns or controls (through a trust known as the Liebowitz Family Limited Partnership) 4.95% of the Harbor Inn partnership shares.

9.    Sheldon Liebowitz owns 4.95% of the Harbor Inn partnership shares.

## JURISDICTION AND VENUE

10.    The Court has original jurisdiction of this Complaint pursuant to 28 U.S.C. Section 1332(a)(1) in that there exists diversity of citizenship between the plaintiffs and the defendant as citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  The Court also has jurisdiction over the claim for declaratory relief pursuant to 28 U.S.C. Section 2201.

11.    Venue is proper in the United States District Court for the Southern District of Florida because the defendant has its principal place of business in Florida and in this district, and a substantial part of the events and transactions giving rise to the claims occurred and continue to occur in this district.  Venue is proper here under 28 U.S.C. Section 1391.

2

## FLORIDA STATUTE 620.8405

A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

(a) enforce such partner's rights under the partnership agreement;

(b) enforce such partner's rights under this act . . .; or

(c) enforce the rights and otherwise protect the interests of such partner, including rights and interests arising independently of the partnership relationship.

## CONDITIONS PRECEDENT

13.     All conditions precedent to bringing this action have occurred, have been met or have been waived.

## GENERAL ALLEGATIONS

**A.     Introductory Statement**

14.     Although the amount of money at issue here is many millions of dollars, neither the facts not the legal issues are complex, and the facts should not be in dispute.

15.     The Harbor Inn partnership was formed pursuant to Florida law on or about March 29, 1993.

16.     The relationship between the parties is governed by two separate contracts: the Harbor Inn Limited Partnership Agreement (the "LPA") dated March 29, 1993, attached hereto as Exhibit 1; and the Harbor Inn Property Management Agreement (the "PMA") dated March 31, 1993, attached hereto as Exhibit 2.

17.     The Property has been held by Harbor Inn as a real estate investment in rental apartments since the partnership's inception. The returns to the limited partners have been based

3

on the quarterly cash flow distributions generated by the rents. However, one of the ultimate

and the LPA, Section 8, sets forth detailed and specific procedures to be followed to effect such a sale (the "Buy-Out Provision"). Ex. 1, LPA at 60-65.

18.     Pursuant to LPA Section 8, a vote of two-thirds (2/3) of the partnership interest is required for a sale. However, if more than half but less than two-thirds of the partnership interest vote in favor of a sale, the partners voting against the sale are **required** to buy out the partnership interests of the partners who vote in favor of the sale based on the "Minimum Gross Prospective Sale Price" approved in the partnership vote. If the partners who vote against the sale are unwilling to complete the buy-out, then the sale proceeds. Thus, whenever at least half of the Partnership's interests vote in favor of a sale, those partners voting in favor of the sale are contractually assured of receiving their proportionate distribution, either by means of a sale of **the Property at the price approved, or from a buy-out based on that same price.**

19.     All the partners except the Marcuses, representing approximately 55% of the partnership interests, voted in favor of a sale based on a notice from the General Partner, MSL. The Marcuses refused the sale. More than one-half, but less than two-thirds thus voted to sell. The Marcuses are required to buy, and are prepared to buy out the other partners, at the specified price. The General Partner, MSL, refuses to proceed under the Buy-Out Provision, and refuses to provide partnership documents to the Marcuses that are necessary for them to proceed and to which they are entitled.

20.     This lawsuit seeks orders requiring the General Partner, MSL, to provide partnership documents and to proceed with the Buy-Out Provision.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

## B.   The Contractual Provisions Governing a Proposed Sale of the Property

shall provide a Notice of Contemplated Sale ("NCS") to each of the Partners." Ex. 1, LPA §8.1.

The NCS may include a range of sale prices but is required to provide a Minimum Gross

Prospective Sale Price (defined in the LPA as "gross proceeds of the sale after all selling

expenses but before payment of any outstanding mortgages(s)[sic]"). Id.

22.     Each partner is then required to respond to the NCS, in writing, within ten (10)

business days. Ex. 1, LPA §8.3.

23.     When more than one-half but less than two-thirds of the Partnership votes in favor

of a sale, the mandatory Buy-Out Provision in LPA Section 8.2 is triggered. The Buy-Out

Provision provides:

> **8.2     Sale Based On Votes of Partners Owning One-Half (1/2) of More But**
> **Less than Two-Thirds (2/3ds) of Total Partnership Interest In Partnership.**
> In the event that Partners owning one-half (1/2) or more but less than two-thirds
> (2/3rds) of the total Partnership interests in the Partnership vote in favor of the
> Sale, then, and in that event, the Partners who do not vote in favor of the sale
> ("Sale Refusal Partners") shall be required to acquire the Partnership Interest of
> those partners who vote in favor of the Sale ("Selling Partners") . . .

Ex. 1, LPA §8.2.

24.     The LPA also specifically requires that the General Partner provide notice of the

vote results to all partners, and affords each of the Sale Refusal Partners the opportunity to

change their vote in favor of a sale. Id. The Buy-Out Provision requires that:

> (a)     First, each Partner shall be advised by written notice ("Sale
> Notice") from the General Partners of the results of the vote; and each Sale
> Refusal Partner shall have ten (10) business days from the receipt of the Sale
> Notice within which to provide the General Partner with written notice of a
> change in vote in favor of the Sale ("Change in Vote Notice") . . . in the event that
> one-half or more, but less than two-thirds (2/3rds) of the total Partnership Interest
> remain as Selling Partners, and the Sale Refusal Partner(s) submit(s) written
> Notice to the General Partners that said Sale Refusal Partner(s) still remain(s)

opposed to the Sale, then, and in that event, each such Sale Refusal Partner shall

Ex. 1, LPA §8.2(a).

25.    After the time period for the Sale Refusal Partners to change their votes has

passed, in the event that they do not change their votes, the LPA requires that the General Partner

inform the Sale Refusal Partners of the amount they must pay to buy out the other partners.

Specifically, the Buy-Out Provision mandates:

> (b)    The General Partners shall provide each Sale Refusal Partner with
> a written notice ("Purchase Amount Notice") setting forth the amount of money
> each Sale Refusal Partner is required to pay to the Selling Partners in order to
> purchase the entire Partnership Interest of the Selling Partners.  The Purchase
> Amount Notice shall specify the Total Purchase Amount; the amount of moneys
> required from each of the Sale Refusal Partners.

Ex. 1, LPA §8.2(b)

26.    The LPA then sets forth the mathematical formula, which calculates what each

Selling Partner shall be entitled to receive from the Sale Refusal Partners.  Id.  It provides in

pertinent part that

> The "Total Purchase Amount" shall be defined to mean the Minimum Gross
> Prospective Sales Price less any and all existing mortgages of record  against the
> subject premises ("Total Purchase Amount"), multiplied by the percentage of
> interest in the Partnership owned by the Selling Partners ("Amount to be paid to
> the Selling Partners" or "APSP").

Id.

27.    Pursuant to this formula, each Selling Partner is entitled to receive from the Sale

Refusal Partners the percentage share each Selling Partner would have received pursuant to a

sale of the property for the Minimum Gross Prospective Sales Price.  Id.

28.    Upon receipt of the Purchase Amount Notice from the General Partner, in

accordance with the mandatory Buy-Out Provisions, the Sale Refusal Partners have ten (10)

business days to tender the funds to the counsel for the Partnership, in trust, for each Selling

Partners in the Partnership to the Sale Refusal Partners." Ex. 1, LPA §8.2.

29.     If a Sale Refusal Partner fails or refuses to pay any or all of his proportionate

share of the Total Purchase Amount, then that "Sale Refusal Partner shall be deemed to have

approved the Sale and the Sale shall proceed . . . if it results in more than 2/3rds of the total

Partnership Interests voting in favor of the Sale . . .." Ex. 1, LPA §8.2(b)(iii).

**C.      MSL Has Failed to Comply with the Mandatory Buy-Out Provision**

30.     On August 23, 2005, the Marcuses received a copy of a NCS (Notice of

Contemplated Sale) previously forwarded to the other limited partners.  A copy of the letter

dated August 22, 2005 to the Marcuses is attached hereto as Exhibit 3.  The letter stated that "all

Partners other than Deane and yourself have signed the Partners Resolution.  That total

represents 55.45% of the Partnership interest.  I hope you will do so as well."  Id.

31.     The enclosure to the August 22 letter was a letter dated August 17, 2005,

addressed to all the limited partners, except the Marcuses, stating that "It appears apparent that

the market has peaked and it is important that [MSL] market this property as soon as possible."

Id.  MSL also provided a schedule showing the results of a potential sale versus the results of a

potential refinancing and then continuing to hold the Property as a rental investment property.

Id.

32.     The NCS, previously sent to all the partners other than the Marcuses, contained a

range of potential sales prices ($42 million to $44 million) and a list of the selling expenses.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

Likewise, the NCS contained a Minimum Gross Prospective Sale Price of $37,292,964.[1]   The

Prospective Sale Price, less the mortgage amount of $11,800,000, and thus share the net pretax

proceeds of the sale in the amount of $25,492,964.  The NCS provided a break-down showing

the precise pretax distribution that each partner would receive.  For example, the Liebowitz

Family Limited Partnership and Sheldon Liebowitz would each receive $1,261,902, with a

4.95% partnership interest each; Adrian Van Zon, with a 9.90% partnership interest, would

receive $2,523,803; and the General Partner, MSL, with a 1% partnership interest would receive

$254,930.

33.     Based on the August 22 NCS (Exhibit 3), and the formulas established in the Buy

Out Provision (Exhibit 1, LPA Section 8), the following chart shows the calculation of the

amount which ultimately must be paid by the Marcuses as Sale Refusal Partners to the Selling

Partners:

| | |
|---|---|
| SALE PRICE | $ 42,000,000 |
| – Selling Expenses | -  4,707,036 |
| | |
| Minimum Gross Prospective Sale Price | $ 37,292,964 |
| – Mortgage Balance as of 8/31/05 | -  11,800,000 |
| | |
| Total Purchase Amount | $ 25,492,964 |
| x interest owned by Selling Partners | x  55.45 % |
| | |
| **Total Purchase Amount** | **$ 14,135,849** |

34.     Because the NCS prepared and sent by MSL contemplated a minimum payment

of nearly $4 million in commissions and bonuses to MSL and MSL affiliates that were not

---

[1] The NCS established a minimum selling price of $42,000,000, and total selling expenses of $16,507,036, which figure included the current outstanding mortgage on the property of $11,800,000.  By contrast, the Minimum Gross Prospective Sale Price is defined in the LPA as the proposed selling price less all selling expenses, but without considering the mortgage balance.  Thus, the Minimum Gross Prospective Sale Price established in the NCS is $37,292,964.

8

supportable by either the LPA or the PMA, the Marcuses refused to assent to a sale on those

the exorbitant and improper fees to MSL and its affiliates. A copy of the Sale Refusal letters are attached hereto as composite Exhibit 4.

35.     Because the Marcuses own 44.55% of the Partnership, more than one-half of the partners but less than two-thirds of the total Partnership voted in favor of the sale, and the Marcuses became Sale Refusal Partners, and are now "required to acquire the Partnership Interest of those partners who vote in favor of the Sale." Ex. 1, LPA §8.2

36.     In accordance with LPA Section 8.2, MSL provided the required Sale Notice to the Marcuses, affording them, as Sale Refusal Partners, the opportunity to change their vote in favor of the sale. A copy of the Sale Notice correspondence related to same is attached hereto as composite Exhibit 5.

37.     The Marcuses did not change their vote and refused to accept a sale that included nearly $4 million in improper fees to MSL and its affiliates. A copy of a supplemental letter of refusal is attached hereto as Exhibit 6.

38.     Because the Marcuses did not change their vote, pursuant to the mandatory Buy-Out Provision, they are now "required to purchase and acquire the Partnership Interest of the Selling Partners" and buy out the other partners. Ex. 1, LPA §8.2(a).

39.     Up to this juncture, the parties had been following the terms of LPA Section 8.2, and MSL specifically acknowledged that it was in effect by sending the NCS and Sale Notice. Following the Marcuses' confirmation of refusal of proposed sale, however, MSL refused to continue with the Buy-Out Provision.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

40.     To date, MSL has refused to provide the Purchase Amount Notice as required by

~~LPA Section 6.2(c)ii and the~~

Marcuses to buy out the Selling Partners.

41.     Rather, MSL has attempted, in bad faith, to thwart the Buy-Out Provision and the

Marcuses' contractual right to purchase the Partnership shares by refusing to send the required

Purchase Amount Notice and by colluding with two of the other partners to retract their votes,

despite the lack of any contractual basis therefor. Consequently, the Marcuses have been unable

to exercise their contractual rights as Sale Refusal Partners under the LPA.

**D.     <u>MSL Has Refused to Provide Partnership Documents</u>**

42.     MSL has refused to provide the Marcuses with Partnership documents to which

the Marcuses are contractually and statutorily entitled. Florida Statute Section 620.8403, titled

"Partner's rights and duties with respect to information" specifically affords the Marcuses access

to the Harbor Inn books and records. "A partnership shall provide partners and their agents and

attorneys access to the books and records of the partnership." Fla. Stat. 620.8403. Florida

Statute Section 620.8403 provides in relevant part:

(3)     Each partner and the partnership shall furnish to a partner . . .
> (a)     Without demand, any information concerning the partnership's
> business and affairs reasonable required for the proper exercise of
> the partner's rights and duties under the partnership agreement or
> this act; and
> (b)     Upon demand, any other information concerning the partnership's
> business and affairs, except to the extent the demand or the
> information demanded is unreasonable or otherwise improper
> under the circumstances.

43.     Similarly, Florida Statute Section 620.134, titled "Limited partner's right to

inspect records and demand information," affords the Marcuses access to the Harbor Inn books

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

and records and entitles them to the documents requested. Florida Station Section 620.134

Each limited partner has the right to:

(1)    Inspect and copy any of the partnership records required to be maintained by s. 620.106; and

(2)    Obtain from the general partners from time to time, upon reasonable demand, and subject to such reasonable standards as may be set forth in the partnership agreement or otherwise established by the general partners and for any purpose reasonable related to the limited partner's interest as a limited partner:

      (a)    True and full information regarding the state of the business and financial condition of the limited partnership;

            * * *

      (c)    Such other information regarding the affairs of the limited partnership as is just and reasonable.

44.    The Marcuses are likewise entitled to the documents they request under the LPA. The LPA requires that MSL maintain "full and accurate records of all transactions of the Partnership . . ." Ex. 1, LPA §12.2. The LPA further entitles the Marcuses, as limited partners, to a "reasonable inspection and examination by the Limited Partners and their authorized representatives of such books of account, which parties shall have the right to make copies thereof." Id. at §12.3.

45.    The Marcuses have made numerous demands for documents which are reasonably related and necessary for the exercise of their rights under the LPA, documents that go directly to the heart of the business and financial condition of Harbor Inn, and which are clearly just and reasonable to be produced to the Marcuses, particularly in light of the mandatory Buy-Out Provision. Copies of demand letters are attached hereto as Exhibit 7. Murray Liebowitz responded to the request by stating: "I will not provide the documents without a court order."

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

46. The Marcuses have sought copies of the current rent roll, property tax bill, engineering reports, ~~contract~~

leases, property surveys, termite policy, and restrictive covenants or deed restrictions. Id. MSL has these Partnership documents and the Marcuses have a clear contractual and statutory right to them. If MSL is permitted to avoid its contractual and statutory obligations to produce the documents, such as the rent rolls, the Marcuses will be unable to exercise their contractual rights to purchase the partnership interests of the Selling Partners under the Buy-Out Provision.

47. Given the Marcuses' clear entitlement to the documentation, no potential injury to MSL will be had by holding MSL to applicable statutes and to the terms of the contract. Conversely, the harm to the Marcuses would be severe.

**COUNT I**
**DECLARATORY RELIEF – THE BUY OUT PROVISION OF THE LPA**

48. The Marcuses incorporate by reference the allegations of paragraphs 1-47.

49. There is a bona fide, actual, present practical need for the declarations sought herein.

50. This matter deals with a present, ascertained state of facts and a present controversy.

51. There is substantial immediacy and reality of the controversy between MSL and the Marcuses.

52. Under the LPA and PMA, MSL has certain contractual duties and responsibilities to facilitate the purchase of the shares by the Marcuses pursuant to the mandatory Buy-Out Provision of LPA Section 8, which MSL has failed to abide by in good faith.

53. MSL and the Marcuses have actual, present, adverse and antagonistic interests in this matter.

12

54.     All adverse or antagonistic interests are before the Court by proper process.

answer the questions propounded from curiosity, but rather to urgently determine the rights of the Marcuses under the LPA.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Declare that as a result of the NCS dated August 22, 2005, and the vote by 55.45% of the partners in favor of the Sale, the provisions of Section 8.2 of the LPA apply;

(b)     Declare that as a result of the NCS dated August 22, 2005, and the vote by 55.45% of the partners in favor of that sale, the Total Purchase Amount is $14,136,000.00;

(c)     Expedite and advance this matter of its docket to prevent further prejudice and injury to the Marcuses; and

(d)     Grant the Marcuses the costs of this action and such other relief as the Court deems just and proper.

## COUNT II
## DECLARATORY RELIEF – ACCESS TO PARTNERSHIP DOCUMENTS

56.     The Marcuses incorporate by reference the allegations of paragraphs 1-47.

57.     There is a bona fide, actual, present practical need for the declarations sought herein.

58.     This matter deals with a present, ascertained state of facts and a present controversy.

59.     There is substantial immediacy and reality of the controversy between MSL and the Marcuses.

60.     Under the LPA and relevant Florida Statutes, MSL is required to provide the Marcuses with certain documents relating to the Partnership.

13

61.     MSL and the Marcuses have actual, present, adverse and antagonistic interests in this matter.

62.     All adverse or antagonistic interests are before the Court by proper process.

63.     This declaration is sought not for the giving of legal advice by the Court or to answer the questions propounded from curiosity, but rather to urgently determine the rights of the Marcuses under the LPA and Florida statutes.

64.     MSL has failed to act in good faith and has failed to comply with the LPA and applicable Florida Statutes by refusing to provide the Marcuses with the documents they have repeatedly requested.

65.     The Marcuses need these documents to exercise their contractual rights under the Buy-Out Provision of the LPA.

WHEREFORE, Plaintiffs respectfully request that this Court declare that the Marcuses are immediately entitled to access to the following Harbor Inn documents from the General Partner:

    (a)     Current Rent Roll;

    (b)     Concessions Detail;

    (c)     Real Estate and Personal Property Tax Bill for 2003 and 2004;

    (d)     Contracts for service to provide the following:

        (i)     Landscaping
        (ii)    A/C Maintenance
        (iii)   Security
        (iv)   Trash Removal
        (v)    Turnover
        (vi)   Cleaning
        (vii)   Cable Television
        (viii)  Laundry Services

    (e)     Most recent water and sewer bills;

14

(f)     Equipment leases;

(h)     Most recent property condition/engineering report;

(i)     Termite insurance policy or bond;

(j)     Property and casualty and other insurance policies for Harbor Inn for the part three (3) years, and any loss reports for those years;

(k)     Plans and specifications related to the Property;

(l)     Certificate of Occupancy for the Property;

(m)     Details of any restrictive covenants, deed restrictions, income restrictions or similar covenants that may affect the use of the property; and

(n)     Such other and further Partnership documents within the control of the General Partner and related to the business of the Partnership, and necessary for the Marcuses to exercise their rights under the Buy-Out Provision.

The Marcuses further respectfully request that the Court grant their costs of this action and such other relief as the Court deems just and proper.

Respectfully submitted,

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 S. Biscayne Blvd., Suite 2500
Miami, Florida 33131-5340
Tel: (305) 350-7202
Fax: (305) 351-2216

By: _____
William K. Hill, P.A.
Florida Bar No. 747180
Melissa Pallett-Vásquez
Florida Bar No. 715816

15

AGREEMENT OF LIMITED PARTNERSHIP

OF

**HARBOR INN OF CS ASSOCIATES, LTD.**
**A Florida Limited Partnership**

THIS AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF
LIMITED PARTNERSHIP ("Agreement"), dated as of March 31, 1993 by
and among M.L. Property Management, Inc., a Florida corporation,
as Original General Partner (the "Original General Partner"), and
M.L. Property Management, Inc., a Florida corporation, and CDS
Industries, Inc., a Florida corporation, both of 2600 E.
Commercial Boulevard, Suite 213, Fort Lauderdale, Florida 33308,
hereinafter referred to by name or as a General Partner and
collectively as the General Partners (the "General Partners") and
Murray Liebowitz and Sheldon Liebowitz, as the Original Limited
Partners (the "Original Limited Partners"), and each of the
individuals, partnership, corporations, trusts, estates and other
entities listed on Exhibit "A1" annexed hereto who execute
Counterpart Signature Pages of this Agreement (collectively and
together with any individual, partnershp, corporation, trust,
estate or other entity hereafter admitted as Limited Partners,
referred to as the "Limited Partners", and, individually, as a
"Limited Partner"). The General Partners and the Limited
Partners are herein sometimes referred to individually as a
"Partner" and collectively as the "Partners".



-1-

WHEREAS, Harbor Inn of CS Associates, Ltd., a Florida Limited Partnership, (the "Partnership") was created pursuant to a Certificate and Agreement of Limited Partnership dated March 24, 1993 and filed with the Office of the Secretary of State, of the State of Florida on March 29, 1993 (said Certificate and Agreement of Limited Partnership dated March 24, 1993 is sometimes referred to herein as the "Original Partnership Agreement");

WHEREAS, the Partnership is presently in existence as a limited partnership under the Revised Uniform Limited Partnership Act of the State of Florida; and

WHEREAS, the Original General Partner desires to transfer one-half (1/2%) percent of the Original General Partner's one (1%) percent interest to M.L. Property Management, Inc., a Florida corporation, and to transfer one-half (1/2%) percent interest of the Original General Partner's one (1%) percent interest to CDS Industries, Inc., a Florida corporation, as set forth on Exhibit "A1" annexed hereto and incorporated herein; and,

WHEREAS, the Original Limited Partners desire to transfer their interests as Original Limited Partners and have these interests reallocated to the Limited Partners in accordance with the Limited Partners percentage interests set forth on Exhibit "A1", annexed hereto and incorporated herein; and

-2-

supersede in its entirety the Original Partnership Agreement and to enter into this Agreement for the purpose of (i) admitting the General Partners and transferring and reallocating the General Partners' interests by and between M.L. Property Management, Inc., a Florida corporation, and CDS Industries, Inc., a Florida corporation, as set forth on Exhibit "A1" annexed hereto and incorporated herein, (ii) admitting the Limited Partners and transferring and reallocating the Limited Partners' interest by and among the Limited Partners, as set forth in Exhibit "A1" annexed hereto and incorporated herein, and (iii) amending, restating and superseding in its entirety the Original Partnership Agreement as hereinafter set forth;

NOW, THEREFORE, the Original General Partner, the General Partners, the Original Limited Partners and the Limited Partners hereby SIGN AND SWEAR TO this Agreement and agree as follows:

SECTION 1

THE PARTNERSHIP

1.1 <u>Continuation of Partnership.</u> The parties hereby continue the Partnership as a Limited Partnership pursuant to the provisions of the Revised Uniform Limited Partnership Act of the State of Florida and in accordance with the transfer and reallocation of interests as set forth on Exhibit A1 attached hereto and incorporated by reference herein.

1.2 <u>Partnership Name.</u> The name of the Partnership shall be Harbor Inn of CS Associates, Ltd., A Florida Limited Partnership, and all business of the Partnership shall be conducted in such

-3-

Partnership or adopt such trade or fictitious names as they may determine to be appropriate upon ten (10) Business Days notice to the Limited Partners.

1.3   **Purpose.**   The sole purpose and business of the Partnership shall be to acquire, own, improve, lease, manage, operate, hold, mortgage, sell and otherwise deal with the Property for investment, or any part thereof, and to conduct such other activities as may be necessary or appropriate to promote the business of the Partnership as set forth above, it being agreed that each of the foregoing is an ordinary part of the Partnership's business. The Partnership shall not engage in any other business without the prior consent of the Partners owning at least two-thirds (2/3rds) of the Interests in the Partnership.

1.4   **Principal Place of Business.**   The principal place of business of the Partnership shall be at 2600 E. Commercial Blvd., Suite 213, Fort Lauderdale, Florida  33308, or at such other location as the General Partners, in their discretion, may determine.

1.5   **Term.**   The term of the Partnership shall commence upon recordation of the Certificate of Limited Partnership by the General Partners in the manner provided by the Act, which filing and recordation shall occur as promptly as possible following the execution and delivery of this Agreement, and the Partnership shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in Section 10 hereof.

-4-

filed, with the Secretary of the State of Florida, and elsewhere as may be required by law, the original and any amended Certificates and other documents, and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as a limited partnership in accordance with the Act.

(b) The name and address of the Agent for service of process on the Partnership shall be Sheldon Liebowitz or any successor as appointed by the General Partners in their sole discretion in accordance with the Act. The registered Office for Service of Process of the Partnership in the State of Florida is located at 2600 E. Commercial Blvd., Suite 213, Fort Lauderdale, Florida 33308.

(c) Upon the dissolution of the Partnership, the General Partners (or, in the event there is no remaining General Partner, any Person elected pursuant to Section 10 hereof) shall promptly execute and cause to be filed certificates of dissolution in accordance with the Act and the laws of any other states or jurisdictions in which the Partnership has filed certificates.

1.7 <u>Title to Property.</u> All real and personal property owned by the Partnership shall be owned by the Partnership as an entity and no Partner shall have any ownership interest in such property in its individual name or right, and each Partner's interest in the Partnership shall be personal property for all

-5-

**purposes.** Except as otherwise provided in this Agreement, the

the name of the Partnership and not in the name of any Partner.

1.8  **Tax Matters Partner.**  Murray Liebowitz shall be the tax matters partner, pursuant to Code Sections 6221 through 6231.

1.9  **Independent Activities.**  (a)  The General Partners and any of their Affiliates shall be required to devote only such time to the affairs of the Partnership as such General Partners determine in their sole discretion may be necessary to manage and operate the Partnership, and each such Person, to the extent not otherwise directed by such General Partners, shall be free to serve any other Person or enterprise in any capacity that it may deem appropriate in its discretion.

(b)  Insofar as permitted by applicable law, the General Partners (acting on their own behalf) and each Limited Partner (acting on its own behalf) may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Partnership or otherwise, without having or incurring any obligation to offer any interest in such activities to the Partnership or any Partner and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Partner from engaging in such activities, or require any Partner to permit the Partnership or any Partner to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Partner, each Partner hereby waives, relinquishes, and renounces any such right or claim of participation.  Anything contained

-6-

hereby agree not to compete, directly or indirectly, with the Partnership within a one (1) mile radius from the Property in renting, owning or managing any multi-family dwellings.

(c)   To the extent permitted by applicable law and except as otherwise provided in this Agreement, each General Partner, when acting on behalf of the Partnership, is hereby authorized to purchase property from, sell property to, or otherwise deal with any Partner, acting on its own behalf, or any Affiliate of any Partner, provided that any such purchase, sale, or other transaction shall be made on terms and conditions which are no less favorable to the Partnership than if the sale, purchase, or other transaction had been entered into with an independent third party.

1.10 **Voting of the Partners.**  Except as otherwise expressly provided herein to the contrary any vote, approval, consent, authorization or other action required to be taken or made by the (i) General Partners shall be made by a vote of the General Partners, and (ii) Limited Partners shall be made by a vote of the Limited Partners owning at least two-thirds (2/3) of the Interests in the Partnership.

1.11 **Payments of Individual Obligations.**  The Partnership's credit and assets shall be used solely for the benefit of the Partnership, and no asset of the Partnership shall be transferred or encumbered for or in payment of any individual obligation of any Partner.

Agreement shall have the following meanings:

(a) <u>Act</u>" means the Florida Uniform Limited Partnership Act.

(b) "<u>Adjusted Capital Account Deficit</u>" means with respect to any Interest Holder, the deficit balance, if any, in such Interest Holder's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Interest Holder is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c) "<u>Adjusted Capital Contribution</u>" means, as of any day, an Interest Holder's Capital Contributions adjusted as follows:

(i) Increased by the amount of any Partnership liabilities which, in connection with distributions pursuant to Sections 5.1(b),(c) and 5.2 hereof, are assumed by such Interest Holder or are secured by any Partnership Property distributed to such Interest Holder;

-8-

(ii) Increased by any amounts actually paid by such

of any Assumption Agreement; and

(iii) Reduced by the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Interest Holder pursuant to Sections 5.1 and 5.2 hereof and the amount of any liabilities of such Interest Holder assumed by the Partnership or which are secured by any property contributed by such Interest Holder to the Partnership.

(d) "Affiliate" means any member of the immediate family of a General Partner (or shareholder of a corporate general partner), any person, firm or entity which, directly or indirectly, controls, is controlled by or is under common control with a General Partner, or any member of his immediate family; or any person, firm or entity which is associated with a General Partner, or any member of his immediate family in a joint venture, partnership or other form of business association. In this definition the term "Control" shall mean the ownership of ten (10%) percent or more of the beneficial interest in the firm or entity referred to, and the term "immediate family" shall mean the spouse, ancestors, lineal descendants, brothers and sisters of the person in question, including those adopted.

(e) "Agreement" or "Partnership Agreement" means this Agreement as amended from time to time. Words such as "herein", "hereinafter", "hereof", "hereto", and "hereunder", refer to this Agreement as a whole, unless the context otherwise requires.

-9-

(f) "<u>Aggregate Capital Contribution</u>" means all contributions made to the capital of the Partnership by a Partner pursuant to Sections 2 and 7 hereof.

(g) "<u>Bankruptcy</u>" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy". A "Voluntary Bankruptcy" means, with respect to any Person, the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization of any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency, or similar statute, law, or regulation, or the filing

-10-

of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

(h) "<u>Business Day</u>" means a day of the year on which banks are not required or authorized to close in the State of Florida.

(i) "<u>Capital Account</u>" means, with respect to any Partner, the Capital Account maintained for such Person in accordance with the following provisions:

(i) To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections 4.4 or 4.6 hereof, and the amount of any Partnership liabilities assumed by such Person or secured by any Partnership Property distributed to such Person.

(ii) To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 4.4 or 4.6 hereof, Partnership or which are secured by any property contributed by such Person to the Partnership.

(iii) In the event all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv) In determining the amount of any liability for purposes of Sections 1.12(c)(i), 1.10(c)(iii), and Sections 1.12(i)i and 1.12(i)ii hereof, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership, General Partners or Interest Holders), are computed in order to comply with such Regulations, the General Partners may make such modifications provided that they are not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 10 hereof upon the dissolution of the Partnership. The General Partners also

unanticipated events might otherwise cause the Agreement not to comply with Regulations Section 1.704-1(b).

(j) "<u>Capital Contributions</u>" means, with respect to any Interest, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Partnership with respect to the interest in the Partnership held by such Person.  The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of the note (or a Person related to the maker of the note within the meaning of Regulations Section 1.704-1(b)(2)(ii)(c) shall not be included in the Capital Account of any Person until the Partnership makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

(k) "<u>Capital Items</u>":  The net proceeds (Less any expenses incurred in connection with the receipt or collection of any such proceeds, which are not applied to set aside for the reduction of Partnership liabilities or the repair, restoration or improvement of Partnership assets, and after retirement of applicable debt or any portion thereof) received by the Partnership upon the occurrence of any of the following events, provided that no such event causes or results in the dissolution of the Partnership: (i) any sale of all or part of the capital assets of the Partnership, (ii) any insurance payments (other than under policies commonly referred to as rent insurance) or damage

(iii) any award or payment made by any governmental authority in connection with the exercise of any right of eminent domain, condemnation or similar right or power; (iv) any refinancing of the Partnership's loans.

(1) "Cash Flow": The excess of cash revenue from Partnership operations over cash disbursements, without deduction for depreciation or cost recovery, and a reasonable allowance for cash reserves for repairs, replacement, contingencies a anticipated obligations (including debt service, capit improvements and replacements) as determined by the Gener Partners. Cash Flow shall not include Capital Items. For th purpose, revenue from Partnership operations shall not includ capital contributions from the Partners, deposits until the sa are forfeited by the persons making such deposits, advance rentals until such time as they are earned by the Partnership, insurance loss proceeds (except for any proceeds of rent interruption insurance), any award or payment made by any governmental authority in connection with the exercise of any right of eminent domain, condemnation or similar right or power, or any proceeds from the sale, exchange, or refinancing of the Property.

(m) "Certificate" means the certificate of limited partnership filed with the Secretary of State to reflect the provisions of this Agreement.

(n) "<u>Closing Date</u>" means   the Closing Date as may be specified in a legal agreement of which the Partnership is a party.

(o) "<u>Code</u>" or "<u>IRC</u>" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(p) "<u>Depreciation</u>" means, for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partners.

(q) "<u>Distributions</u>" means any cash or property distributed to any Interest Holders arising from their interests in the Partnership, other than payments to an Interest Holder for services or as repayment of loans or advances.

(r) "<u>General Partner(s)</u>" means the General Partners of the Partnership, and means any Person, corporation, and/or any other Sub S corporation who at the time of reference has been admitted as a General Partner or a successor to a General Partner, or an additional General Partner.

(s) "<u>General Partnership Interest</u>" means the general partnership ownership interest of the General Partners in the Partnership, including the rights of the General Partners to any and all benefits to which he may be entitled pursuant to this Agreement, together with the obligations of the General Partners to comply with all the terms and provisions of this Agreement.

(t) "<u>Gross Asset Value</u>" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partners, provided that, if the contributing Partner is a General Partners, the determination of the fair market value of a contributed asset shall require the consent of a majority of the Limited Partners;

(ii) The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partners, as of the following times:

(a) the acquisition of an additional interest in the Partnership (other than pursuant to Sections 5.1 or 5.2 hereof) by any new or existing Partner in exchange for more than a de minimus Capital Contribution;

(b) the distribution by the Partnership to an Interest Holder of more than a de minimus amount of Partnership Property as consideration for an interest in the Partnership; and

(c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partners reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the General Partners and Interest Holders in the Partnership.;

(iii) The Gross Asset Value of any Partnership asset distribution to any General Partners or Interest Holder shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the General Partners, provided that, if the distributee is a General Partner, the determination of the fair market value of the distributed asset shall require the consent of a majority of the Limited Partners; and

(iv) The Gross Asset Value of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant

to Regulations Section 1.704-1(b)(2)(iv)(m)

hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 1.12(t)(iv) to the extent the General Partner determines that an adjustment pursuant to Section 1.12(t)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.12(t)(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Sections 1.12(t)(i), 1.12(t)(ii), or 1.12(t)(iii) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(u) "Interest" means a percentage ownership interest in the Partnership, in accordance with the percentage Capital Contribution made by a Partner pursuant to Exhibit A hereof together with any additional contribution subsequently made pursuant to Section 7 herein and as contemplated by this Agreement, including the right of any such Partner to any and all benefits to which the holder of such interest may be entitled pursuant to this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

(v) "Interest Holder" means any Person who holds an Interest. "Interest Holders" means all such Persons.

names are set forth on Exhibit "Al" attached to this Agreement, and such other persons as are admitted to the Partnership as substitute or additional Partners and are named as Limited Partners in any amended Certificate of the Partnership. Further, it includes the General Partners in their capacity as a holder of a Limited Partnership Interest, where no distinction is required by the context in which the term is used herein. Reference to a "Limited Partner" shall be to any one of the Limited Partners.

(x) "Management Agreement" means that certain Management Agreement, dated as of the Closing Date, between the Partnership and M.L. Property Management, Inc., pertaining to the operation and management of the Property.

(y) "Memorandum" means that certain Confidential Private Placement Memorandum dated as of March 1, 1993, including all amendments or supplements thereto relating to the sale of Units of limited partnership of the Partnership.

(z) "Net Cash From Operations" means the gross cash proceeds from Partnership operations (including sales and dispositions of Property in the ordinary course of business) less the portion thereof used to pay all cash expenditures incurred incident to the normal operation of partnership business including those expenses of the General Partners reimbursed by the Partnership pursuant to the terms hereof, or to establish reserves for all Partnership expenses, debt payments, capital improvements, replacements, and contingencies, all deemed by the General Partners in their sole and absolute discretion to be

reasonably necessary for proper operation of the Partnership's business. "Net Cash From Operations" shall not be reduced by depreciation, amortization, cost recovery deductions, or si~~~~ allowances, but shall be increased by any reductions of res previously established pursuant to the first sentence of Section 1.12(z) and Section 1.12(aa) hereof.

(aa) "Net Cash From Sales or Refinancings" means th cash proceeds from all sales and other dispositions (other in the ordinary course of business) and all refinancin_ Partnership Property, less any portion thereof used to establish reserves, all as determined by the General Partners. "Net Cash From Sales or Refinancings" shall include all principal and interest payments with respect to any note or other obligation received by the Partnership in connection with sales and other dispositions (other than in the ordinary course of business) of Partnership Property.

(bb) "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

(cc) "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

(dd) "Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

(ee) "Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimus Gain that would result if such Partner

Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

(ff) "Partner Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

(gg) "Partners" means all General Partners and all Limited Partners, where no distinction is required by the context in which the term is used herein. "Partner" means any one of the Partners.

(hh) "Partnership" means the partnership formed pursuant to this Agreement and the partnership continuing the business of this Partnership in the event of dissolution as herein provided.

(ii) "Partnership Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(jj) "Partnership Property" means all real and personal property acquired by the Partnership and any improvements thereto, and shall include both tangible and intangible property.

(kk) "Person" means a any individual, trust, estate, partnership, association, company, corporation or other entity.

(ll) "Prime Rate" means the prime lending rate of interest established from time to time by Chemical Bank, New York, N.Y.

(mm) "Priority Return" means a sum equivalent to fifteen percent (15%) per annum, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days in the period for which the Priority Return is being determined, cumulative but not compounded, of the average daily balance of

-21-

the aggregate Capital Contributions of the Interest Holders from time to time during the period to which the Priority Return relates, commencing on the first date any money is paid that relates to the Priority Return.

(nn) "<u>Profits and Losses</u>" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.12(nn) shall be added to such taxable income or loss;

(ii) Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.12(nn), shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to Sections 1.12(t)(ii) or 1.12(t)(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such assets for purposes of computing Profits or Losses;

Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with Section 1.12(p) hereof;

(vi) To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Partner's or Holder's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this Section 1.12(nn), any items that are specially allocated pursuant to Sections 4.4 and 4.6 (Special Allocations and Curative Allocations) hereof shall not be taken into account in computing Profits or Loses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 4.4 and 4.6 (Special Allocations and Curative Allocations) hereof shall be determined by applying rules analogous to those set forth in Sections 1.12(nn)i through vi above.

(oo) "<u>Property</u>" means that certain land and building located at Harbor Inn, 801 Harbor Drive, Coral Springs, Florida.

(pp) "<u>Regulations</u>" means the Income Tax Regulations promulgated under the Code as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

(qq) "<u>Section</u>" means the designated Section of this Agreement if no reference is specified; otherwise, the designated Section of the specified statute or regulation or the comparable provision of any successor statute or regulation.

(rr) "<u>Substitute Partner</u>" means a Partner, other than the existing General Partners and the existing Limited Partners listed on Exhibit "A1", who is subsequently admitted to the Partnership pursuant to the provisions of Sections 9 and 11 herein, and possesses all rights and obligations granted to (and imposed upon) General Partners or Limited Partners, as the case may be, pursuant to this Agreement.

(ss) "<u>Transfer</u>" means the mortgage, pledge, hypothecation, transfer, sale, assignment or other disposition of any part of all of any Interest in the Partnership, whether voluntarily, by operation of law or otherwise.

(tt)   "Uniform Act" means the Florida Revised Uniform Limited Partnership Law, as amended from time to time.

(uu)   "Unit" means a percentage ownership interest in the Partnership representing a capital contribution of $20,000.00 to the Partnership.

(vv)   "Unit Holder" means any person who holds a Unit. "Unit Holders" means all such persons.

(ww) "Unreturned Capital of the Partners" means as at any given time, an amount equal to the excess, if any, of (i) the aggregate capital contributions theretofore made by the Partners to the Partnership pursuant to Section 5.1 and 10, computed without interest thereon, over (ii) all amounts theretofore distributed or distributable to the Partners pursuant to Section 8, but in no event less than zero.

## SECTION 2

### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

2.1   **General Partners.**   The names, addresses, and Capital Contributions of each General Partner are set forth on Exhibit A1 attached hereto.

2.2   **Limited Partners.**   The names, addresses, Capital Contributions, and Interests of the Limited Partners are as provided herein as of the date of this Agreement as set forth on Exhibit A1 attached hereto.

2.3   **Capital Accounts.**   Each Partner shall have a Capital Account equal to the amount of his capital contribution to the Partnership made on or before the execution of this Agreement

pursuant to Section 7 and as contemplated in accordance with the provisions of this Agreement, and such Capital Account shall be credited with the cash and the fair market value of the property contributed to the Partnership (net of liabilities assumed by the Partnership and liabilities to which such contributed property is subject), and his distributive share of Partnership income (including income exempt from tax) and gain (or items thereof). Each Partner's Capital Account shall be debited with the cash and the Partnership's fair market value of property distributed to him (net of liabilities assumed by such Partner and liabilities to which such distributed property is subject), his distributive share of the Partnership losses and deductions (or items thereof) and his distributive share of expenditures of the Partnership described in Code Section 705(a) (2)(B) or otherwise required to be treated as expenditures described in Section 705(a) (2)(B). The amount of income and gain credited to each Partner's Capital Account shall be the amount of profits allocated to each Partner in accordance with the provisions of Sections 4 and 7 hereof. The amount of losses and deductions debited to each Partner's Capital Account shall be the amount of loss allocated to each Partner in accordance with the provisions of Sections 4 and 7 hereof.  If there is any question with respect to a Partner's Capital Account (including but not limited to, whether such Capital Account is being maintained in a manner consistent with the Code), it shall be resolved by the General Partners in their

-26-

with this Agreement, the Uniform Act and applicable provisions of the Code and the Regulations thereof.

2.4 <u>Determination of Balance in Capital Accounts.</u> Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account of any Partner for purposes of Section 7 or 8, the Capital Account of the Partner shall be determined after giving effect to all allocations provided for herein for the current year in respect of transactions effected prior to the date as of which such determination is to be made.

2.5 <u>Withdrawal of Capital.</u> Except as specifically provided in this Agreement, no Partner shall be entitled to withdraw any part of his Capital Account or to receive any distribution from the Partnership, and no Partner shall be entitled or required to make any additional capital contribution to the Partnership except as specifically provided herein.

2.6 <u>Capital Accounts of New Partners.</u> Each Limited Partner, including any additional, new, or Substitute Limited Partner, who shall receive any Interest in the Partnership or whose Interest in the Partnership shall be increased by means of a Transfer to him of all or part of the Interest of another Partner in accordance with Sections 7 and 9 and as contemplated by this Agreement, shall have a Capital Account which reflects such Transfer.

2.7 <u>Allocation Among Partners.</u> Whenever amounts are allocated or distributed to the Partners, the total amount allocated or distributed to all the Limited Partners shall be

ninety nine (99%) percent.   Such amount shall be allocated or distributed among the Limited Partners in the proportion that the Interest each owns bears to the aggregate Interest of all the Limited Partners at the time of such allocation or distribution. Whenever amounts are allocated or distributed to the Partners, such amounts shall be allocated or distributed to the General Partners in accordance with their Partnership interests which are hereby reallocated effective as of the date of this Agreement as follows:

M.L. Property Management, Inc. . .One-Half(1/2%)Percent

CDS Industries, Inc. . . .. . . . One-Half(1/2%)Percent

In the event of Transfers or dilutions in accordance with Section 7.2 et. seq. of any Partnership Interests, the provisions and allocations in this Section 2.7 shall be subject to such adjustments as are provided therein.

2.8   **Partner's Loans.**   Loans by any Partner to the Partnership shall not be considered contributions to the capital of the Partnership.

- 2.9   **Liability of Limited Partner.**   A Limited Partner shall not be bound by, or personally liable for, any of the debts, contracts, liabilities or other obligations of the Partnership or the General Partners, and the liability of each Limited Partner shall be limited solely to the amount of his contribution to the capital of the Partnership required by the provisions of Sections 2.2, 7 and 10.   No Partner with a negative balance in his Capital Account shall have any obligation to the Partnership or the other Partners to restore such negative balance.   Notwithstanding any

-28-

ninety nine (99%) percent.   Such amount shall be allocated or distributed among the Limited Partners in the proportion that the Interest each owns bears to the aggregate Interest of all the Limited Partners at the time of such allocation or distribution. Whenever amounts are allocated or distributed to the Partners, such amounts shall be allocated or distributed to the General Partners in accordance with their Partnership interests which are hereby reallocated effective as of the date of this Agreement as follows:

M.L. Property Management, Inc. . .One-Half(1/2%)Percent

CDS Industries, Inc. . . .. . . . One-Half(1/2%)Percent

In the event of Transfers or dilutions in accordance with Section 7.2 et. seq. of any Partnership Interests, the provisions and allocations in this Section 2.7 shall be subject to such adjustments as are provided therein.

2.8   **Partner's Loans.**   Loans by any Partner to the Partnership shall not be considered contributions to the capital of the Partnership.

- 2.9   **Liability of Limited Partner.**   A Limited Partner shall not be bound by, or personally liable for, any of the debts, contracts, liabilities or other obligations of the Partnership or the General Partners, and the liability of each Limited Partner shall be limited solely to the amount of his contribution to the capital of the Partnership required by the provisions of Sections 2.2, 7 and 10.  No Partner with a negative balance in his Capital Account shall have any obligation to the Partnership or the other Partners to restore such negative balance.   Notwithstanding any

or the foregoing provisions to the contrary, to the extent required by applicable law, a Partner receiving a distribution in part of full return of his capital contribution shall be liable to the Partnership for any sum, not in excess of such amount returned plus interest, necessary to discharge the liabilities of the Partnership to creditors who extended credit or whose claims arose before such distribution, excluding liabilities of the Partnership represented by debt, the repayment of which is secured solely by the Property.

2.10 **Interest on Capital Contributions.** No interest shall be paid on any capital contributed to the Partnership, except as may be otherwise provided in this Agreement.

## SECTION 3

## CONTROL AND MANAGEMENT

3.1 **General.** Except as specifically limited herein, the General Partners shall have full, exclusive and completed discretion in the management and control of the Partnership for accomplishing the purposes set forth in Section 1.3. The General Partners agree to manage and control the affairs of the Partnership to the best of its ability, and to conduct the operations contemplated under this Agreement in a careful and prudent manner and in accordance with good industry practice.

The General Partners shall have full power and authority to execute all documents and take all other actions on behalf of the Partnership.

-29-

3.2   <u>Powers of the General Partners.</u>   Subject to any limitation expressly set forth in this Agreement, the General Partners shall perform or cause to be performed, at the Partnership's expense and in his name, the coordination of all management and operational functions relating to the Property so that the Property is operated in a first-class manner.   Without limiting the generality of the foregoing, the General Partners (subject to the provisions of Section 3.3) are expressly authorized on behalf of the Partnership to:

(a)   operate any business normal or customary for the owner of a project similar to the Property;

(b)   borrow money on behalf of the Partnership on a secured or unsecured basis, or refinance or modify any loan to the Partnership which affects the assets of the Partnership;

(c)   perform any and all acts necessary or appropriate to the acquisition and operation of the Property, including, but not limited to, making applications for rezoning or objections to rezoning of other property, and commencing, defending, and/or settling litigation regard the Partnership, the Property or any aspect thereof;

(d)   procure and maintain with responsible companies such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partners;

(e)   take and hold all property of the Partnership, real, personal and mixed, in the Partnership name, or in the name of a nominee of the Partnership solely for the purpose of placing a deed of trust or mortgage on the Property or closing a loan relating to the Property;

(f)   execute and deliver on behalf of and in the name of the Partnership, or in the name of a nominee Partnership, deeds, deeds of trust, notes, leases, s¹ mortgages, bills of sale, financing statements, agreements, easements, assignments and any and al instruments necessary or incidental to the conduct Partnership's business and the financing thereof;

(g)   bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of, or against, the Partnership;

(h)   establish reasonable reserve funds from income derived from the Partnerships' operations to provide for future contingencies;

(i)   loan funds to the Partnership, directly or through an affiliate, and to charge interest therefor;

(j)   coordinate all accounting and clerical functions of the Partnership and employ such accountants, lawyers, managers, agents and other management or service personnel as may from time to time be required to carry on the business of the Partnership;

at Paragraph 6.1, et seq., of the within Partnership Agreement, or any subsequent leases or use agreements pertaining to the Property;

(l) negotiate, execute, deliver and perform any and all mortgages, financing, notes, letters of credit, insurance, certificates and/or agreements including the John Hancock Mortgage (as defined in the Memorandum), and any and all amendments, modifications, addendums, renewals, etc., related thereto and necessary or convenient in connection therewith; and,

(m) designate, in writing, representatives with authority to approve/disapprove, consent to or act on behalf of the Partnership in connection with the performance of the within Agreement, the Management Agreement and any and all other instruments or documents necessary or convenient therewith.

3.3 <u>Limitations on Power of the General Partner.</u> Notwithstanding the generality of the foregoing, the General Partner shall not be empowered without the consent of the Limited Partner owning at least two-thirds (2/3rds) of the Interest in the Partnership (allocated pursuant to Section 2.7 of this Agreement) to:

(a) do any act in contravention of this Agreement;

(b) do any act that would make it impossible to carry on the ordinary business of the Partnership;

(c) confess a judgment against the Partnership

in specific Partnership property for other than a Partnership purpose;

(e)   admit a person as a General Partner into the Partnership;

(f)   change or reorganize the Partnership into any other legal form;

(g)   require the Limited Partners to make any contribution to the capital of the Partnership not provided for in Sections 2, 7 or Section 10 of this Agreement;

(h)   utilize the proceeds to be received by the Partnership pursuant to Section 5.1 for purposes other than as set forth under the caption "Sources and Uses of Proceeds" in the Memorandum;

(i)   relieve the General Partners of any liability under this Agreement due to their assignment of interest in the Partnership; or

(j)   admit additional or Substitute Limited Partners, except as provided in Sections 9 and 11 of this Agreement.

3.4   <u>No Management Powers by Limited Partners.</u>   The Limited Partners shall take no part in the conduct or control of the Partnership business and shall have no right or authority to act for or to bind the Partnership.   The exercise of any of the rights and powers of a Limited Partner pursuant to the terms of this Agreement shall not be deemed as taking part in the day-to-day affairs of the Partnership or the exercise of control over Partnership affairs.

-33-

3.5   Liability of General Partners.   The General Partners shall not be personally liable for the return of any portion of the Aggregate Capital Contributions of the Limited Partners.

3.6   Right to Engage in Other Ventures.   Any Partner may engage in or possess an interest in another business ventures of any nature or description independently or with others including, but not limited to, real estate business in all its phases, which shall include, without limitation, the ownership, operation, management, syndication and development of real property. Neither the Partnership nor any Partner shall have any righ or to such independent ventures or the income or profits de therefrom by virtue of this Agreement.

3.7   Limitation on Obligations of the General Partners. General Partners shall not be required to devote all of its or business efforts to the affairs of the Partnership, but devote such of its time and attention as is reasonably advisable and necessary to manage the affairs of the Partnership.   Except as otherwise specifically set forth below, the General Partners shall not be liable to the Limited Partners because any taxing authorities disallow or adjust any deductions or credits in the Partnership's income tax returns.

3.8   Indemnification of General Partners and Partnership. The General Partners shall not be liable, responsible or accountable in damages or otherwise to any other Partner for any act performed or failure to act by them in good faith and within the scope of this Agreement, unless such act or failure to act is attributable to gross negligence, malfeasance or fraud.   The

hold harmless the General Partners for any loss, damage, liability, cost or expense (including reasonable attorney's fees) arising out of any act or failure to act by the General Partners if such act or failure to act is in good faith within the scope of this Agreement and is not attributable to gross negligence, malfeasance or fraud. The General Partners shall indemnify and hold harmless the Partnership and the Partners for any loss, damage, liability, cost or expense (including reasonable attorney's fees) arising out of any act or failure to act by such General Partner, where such act or failure to act is attributable to gross negligence, malfeasance or fraud.

3.9 **Dealings with the General Partners and Affiliates.** Provided the General Partners shall have the Owner's written approval, the Partnership is authorized to enter into business agreements, contracts, and other transactions with the General Partners or any Affiliates of the General Partners or the Affiliates of the shareholders of the General Partners ("Affiliates of General Partners"), and is authorized to pay fees, commissions or other consideration to the General Partners or Affiliates of the General Partners, including without limitation, real estate brokerage commissions. insurance premiums, rental property management fees, consulting fees, leasing commissions and mortgage brokerage fees. Unless such transactions are expressly authorized herein, any such transactions between the Partnership and a General Partner or

Affiliates of a General Partner shall be on terms not less favorable to affiliated parties.

## SECTION 4

## ALLOCATIONS OF INCOME, NET LOSSES AND CREDITS

4.1  **Allocation of Profits and Losses.**  All profits, gains, losses, credits and deductions of the Partnership, as determined for federal income tax purposes, shall be allocated in the following order of priority (and for these purposes only, the calculations under this Section and under Section 4.2 shall treat and refer to the Limited Partners as one class and the General Partner as another class, but any gain or loss allocated to the Limited Partners or the General Partners, as a group, shall be allocated among the Limited Partners and the General Partners as prescribed in Section 2.7) (unless otherwise provided herein).

(a)  **Allocation of Profits and Gains.**  Profits of the Partnership, as determined for federal income tax purposes, and gains of the Partnership shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners.

(b)  **Allocation of Losses.**  Losses and tax credits of the Partnership, as determined for federal income tax purposes, shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners.

-36-

4.2  <u>Dissolution and Winding Up.</u>  All profits and net losses of the Partnership, as determined for federal income tax purposes, in connection with a sale of substantially all of the assets of the Partnership and/or the dissolution and winding up of the Partnership, shall be allocated in the manner provided in Sections 4.1 and 5.1.

4.3  <u>Distributive Share; Charges and Credits to Capital Accounts.</u>  For purposes of Subchapter K of the Code, the distributive shares for any fiscal year of the Partners in each item of Partnership taxable income, gain, loss, deduction or credit shall be in the same proportions as their respective shares of items allocated under Paragraphs 4.1 and 4.2 (except as may be otherwise provided in the within Agreement).  All profits, losses and distributions shared by the Partners shall be credited or charged, as the case may be, to their Capital Accounts, and allocated between or among the members of each class of Partners in accordance with their respective sharing ratios within such class; provided, that, upon a sale pursuant to the liquidation of the Partnership, profits and losses shall be allocated in a manner that will first equalize to the extent possible the Capital Accounts of all Partners and then in accordance with their respective sharing ratios.  Each Partner shall share in profits, losses and cash contributions from the first day of the calendar month during which said Partner was admitted to the Partnership, if he is admitted on or after the first day of such month and on or before the fifteenth day thereof, and he shall share in profits, losses and cash distributions from the

sixteenth day of the calendar month during which

to the Partnership, if he is admitted on or after the sixteenth
day of such month and on or before the 1st day of such month. For
such purposes and to the extent permitted by the Uniform Act, the
date of admission to the Partnership of a Partner shall be the
date of his execution of this Agreement, if his subscription for
an Interest is accepted by the General Partners.

4.4 **Special Allocations.** The following special allocations
shall be made in the following order:

(a) **Minimum Gain Chargeback.** Except as otherwise
provided in Section 1.704-2(f) of the Regulations,
notwithstanding any other provision of this Section 4, if there
is a net decrease in Partnership Minimum Gain during any Fiscal
Year, each General Partner and Interest Holder shall be specially
allocated items of Partnership income and gain for such Fiscal
Year (and, if necessary, subsequent Fiscal Years) in an amount
equal to such Person's share of the net decrease in Partnership
Minimum pursuant to the previous sentence shall be made in
proportion to the respective amounts required to be allocated to
each General Partner and Interest Holder pursuant thereto. The
items to be so allocated shall be determined in accordance with
Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations.
This Section 4.4(a) is intended to comply with the minimum gain
chargeback requirement in Section 1.704-2(f) of the Regulations
and shall be interpreted consistently therewith.

(b)  <u>Partner Minimum Gain Chargeback.</u>  Except as otherwise provided in Section 1.704-2(i)4 of the Regulations, notwithstanding any other provision of this Section 4, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Partnership Fiscal Year, each Person who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)5 of the Regulations, shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Person's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each General Partner and Interest Holder pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 4.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)  <u>Qualified Income Offset.</u>  In the event any Interest Holder unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be

specially allocated to each such General Partner and Interest Holder in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Interest Holder as quickly as possible, provided that an allocation pursuant to this Section 7.4(c) shall be made only if and to the extent that such Interest Holder would have an Adjusted Capital Account Deficit after all other allocations provided for this Section 4.4 have been tentatively made as if this Section 4.4(c) were not in the Agreement.

(d)   <u>Gross Income Allocation.</u>   In the event any Interest Holder has a deficit Capital Account at the end of any Partnership Fiscal Year which is in excess of the sum of (i) the amount such General Partner and Interest Holder is obligated to restore pursuant to any provision of the Agreement, and (ii) the amount such Interest Holder is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Interest Holder shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.4(d) shall be made only if and to the extent that such General Partner and Interest Holder would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made as if Section 4.4(c) hereof and this Section 4.4(d) were not in the Agreement.

for any Fiscal Year shall be specially allocated one percent (1%) to the General Partner and ninety nine percent (99%) to the Interest Holders exclusive of the General Partners.

(f)  **Partner Nonrecourse Deductions.**  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the General Partner or Interest Holder who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(g)  **Section 754 Adjustments.**  To the extent an adjustment to adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a General Partner or Interest Holder in complete liquidation of his interest in the Partnership, the amount of such adjustment to Capital Accounts as the result of a distribution to a General Partner or Interest Holder in complete liquidation of his interest in the Partnership, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the General Partner and the Interest Holders in accordance with their interests in the

-41-

1(b)(2)(iv)(m)(2) applies, or to the General Partner or Interest Holder to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(h) <u>Priority Return Allocations.</u> All or a portion of the remaining items of Partnership income or gain, if any, shall be specially allocated to the Interest Holders in proportion to and to the extent of the excess, if any, of (i) the Cumulative Priority Return distributions each such Interest Holder has received pursuant to Section 4.4(a) and Section 5.1(c)(iv) hereof from the commencement of the Partnership to a date thirty (30) days after the end of such Fiscal Year, over (ii) the cumulative items of income and gain allocated to such General Partner or Interest Holder pursuant to this Section 4.4(h) for all prior Fiscal Years.

(i) <u>Allocations Relating to Taxable Issuance of Partnership Interests.</u> Any income, gain, loss. or deduction realized as a direct or indirect result of the issuance of an Interest by the Partnership to a Partner (the "Issuance Items") shall be allocated among the General Partners and Interest Holders so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each General Partner and Interest Holder, shall be equal to the net amount that would have been allocated to each such General Partner and Interest Holder if the Issuance Items had not been realized.

-42-

4.5   <u>Qualified Income Offset, Minimum Gain, Recapture of Special Allocations.</u>   Notwithstanding any provision of this Agreement to the contrary, if a Partner receives an unexpected adjustment, allocation or distribution described in Treas. Reg. Section 1.704-1(b)(2)(ii)(D)(4), (5) or (6) which creates or increases a deficient balance in the Partner's Capital Account, items of income and gain shall be allocated to such Partner in an amount and manner sufficient to eliminate the Partner's Capital Account deficit as quickly as possible.   If any allocations are made pursuant to the previous sentence, then future allocations of income or gain to such Partner will be reduced by an amounyt of income or gain equal to the amount previously allocated to the Partner under the previous sentence.

4.6   <u>Curative Allocations</u>. The allocations set forth in the subsections of this Section 4 which refer to the Regulations (the "Regulatory Allocations")   are intended to comply with certain requirements of the Regulations.   It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 4.6.   Therefore, notwithstanding any other provision of this Section 4 (other than the Regulatory Allocations), the General Partners shall make such offsetting special allocations of Partnership income, gain, loss, or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Interest Holder's Capital Account balance is, to the extent possible,

equal to the Capital Account balance such General Partner or Interest Holder would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to the subsections of this Section 4 not referring to the Regulations.  In exercising their discretion under this Section 4.6, the General Partners shall take into account future Regulatory Allocations under Sections 4.4(a) and 4.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.4(e) and 4.4(f).

### 4.7  Other Allocation Rules.

(a) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Regulations thereunder.

(b) All allocations to the Interest Holders pursuant to this Section 4 shall, except as otherwise provided, be divided among them in proportion to the Interests held by each.  In the event there is more than one General Partner, all such allocations to the General Partners shall be divided among them as they may agree.

(c)   The Partners   are   aware   of   the   income   tax consequences of the allocations made by this Section 4 and hereby agree to be bound by the provisions of the Section 4 in reporting their shares of Partnership income and loss for income tax purposes.

(d) Solely for purposes of determining a Partner's or Interest Holder's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Regulations Section 1.752-3(a)(3), the Partnership within the meaning of Regulations Section 1.752-3(a)(3), the Partners' and Interest Holders" interests in Partnership profits are as follows: General Partners one percent (1%) and Interest Holders ninety nine percent (99%) (in proportion to their interests).

(e) To the extent permitted by Section 1.704-2(h)(3) of the Regulations, the General Partners shall endeavor to treat distributions of Net Cash From Operations or Net Cash From Sales or Refinancings as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Interest Holder.

4.8   **Tax Allocations: Code Section 704(c)**. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the General Partners and Interest Holders so as to take account of any variation between

the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value (complied in accordance with Section 1.12(t)(i) hereof).

In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to Section 1.12(t)(i) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the General Partners in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.8 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other Items, or distributions pursuant to any provision of this Agreement.

- 4.9 **Miscellaneous.** If there is a net decrease in the Partnership's Minimum Gain (as defined in regulations under Section 704(b) of the Code) during a Partnership year, each Partner with a deficient balance in his Capital Account at the end of the Partnership year will be allocated, before any other allocation of Partnership items is made pursuant to this Agreement, items of income and gain for the Partnership year and, if necessary, subsequent Partnership years in the amount necessary to eliminate such deficit as quickly as possible. For

the preceding paragraph, there will be excluded from the Partner's deficient balance in his Capital Account (i) any amount the Partner is obligated to restore to his Capital Account and (ii) any addition to his Capital Account represented by the Partner's share of Minimum Gain. In addition, for the purpose of calculating the amount of Minimum Gain, each Partner's Capital Account will be reduced for items described in Treas. Reg. Section 1.704-1(b) (2) (ii) (D) (4), (5) and (6).

Notwithstanding anything to the contrary contained in this Agreement, if any gain arises from the sale disposition of any Partnership asset which shall be t income under the depreciation or investment credit provisions of the Code, then the full extent of such ( be allocated to the Partners on the basis that the P deductions for depreciation or investment credit giving rise to such recapture where actually allocated. In the event that subsequently enacted provisions of or relating to the Code result in other recapture income to the Partnership, no allocation of such recapture income shall be made to any Partner who has not received the benefit of those items giving rise to such other recapture income.

## SECTION 5

## DISTRIBUTIONS

5.1 (a) <u>Cash Flow Distributions.</u> After providing for the satisfaction of the current debts and obligations of the Partnership, including any priority return and making any

-47-

the General Partners shall, after the end of each fiscal quarter of the Partnership, make distributions of Cash Flow from operations to the Partners out of the Partnership funds, to the extent available, which shall be allocated ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners, in accordance with the provisions of this Agreement.

(b)    **Proceeds from Refinancing, Sale or Other Disposition of the Property.**    Distribution of Capital Item (other than any sale or other disposition of substantially all the assets of the Partnership) shall be made as expeditiously possible, in the following order of priority:

(i)   first, to repay any New Additional Partn Existing Partner who has contributed Excess Additional Cap all moneys, plus accrued interest that may then be due thereon; and

(ii) then ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners to the extent necessary to reduce the Unreturned Capital of the Partners to zero; and

(iii) the balance, ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners in accordance with their then respective percentage interest in the Partnership.

sale or disposition of substantially all of the assets of the Partnership and/or the dissolution and winding up of the Partnership, the assets of the Partnership, after making payment of or provision for payment of all liabilities and obligations of the Partnership (other than in regard to any loans made pursuant to Section 7.0) shall be distributed, as expeditiously as possible, in the following order of priority:

(i)   first, an amount equal to the unpaid principal of and interest on loans made pursuant to Section 7.1 shall be distributed pro rata to the Partners who made such loans, such distributions being treated first as in payment of accumulated interest on such loans and next as in payment of principal of such loans;

(ii) next, setting up such reserves as the person required by law to wind up the Partnership's affairs may reasonably deem necessary for any contingent liabilities or obligations of the Partners, provided that any such reserves shall be paid by such person to an independent escrow agent, to be held by such agent or his successor for such period as such persons shall deem advisable for the purpose of applying such reserves to the payment of such liabilities or obligations and, at the expiration of such period, the balance of such reserves, if any, shall be distributed as hereinafter provided; and

-49-

(iii) next, to repay any

Existing Partner who may have contributed Excess Capital as provided in Paragraph 2, all monies, plus accrued interest, that may then be due thereon; and

(iv) next, ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners, to the extent necessary to reduce the Unreturned Capital of the Partners to zero; and

(v) the balance, ninety nine (99%) percent to the Limited Partners and one (1%) percent to the General Partners in accordance with their then respective percentage interest in the Partnership.

5.2 **Distribution in Kind.** If any assets of the Partnership shall be distributed in kind, such assets shall be distributed to the Partners entitled thereto as tenants-in-common in the same proportions as such Partners would have been entitled to cash distributions if (i) such assets had been sold for cash by the Partnership at their then fair market value, (ii) any taxable gain that would be realized by the Partnership from such sale was allocated among the Partners in accordance with Section 4.1 and (iii) the cash proceeds were distributed to the Partners in accordance with Section 5.1(b) or (c) as applicable. The Capital Accounts of the Partners shall be increased by the amount of any gain that would be allocable to them, and shall be reduced by the fair market value of the assets distributed to them, under the preceding sentence.

to Property.   No Partner shall be entitled to demand and receive property for his capital contributions to the Partnership, and, to the maximum extent permissible under applicable law, each Partner hereby waives all right to partition the Property.

5.4   <u>Priorities of Limited Partners.</u>   No Limited Partner shall have any priority over any other Limited Partner as to the return of his contributions to the capital of the Partnership or as to compensation by way of income, except as may be otherwise provided in this Agreement.

### SECTION 6

#### CERTAIN MATTERS RELATING TO MANAGEMENT OF THE PARTNERSHIP; PARTNERSHIP EXPENSES; REPLACEMENT RESERVE ACCOUNT

6.1   <u>Property Management.</u>   M.L. Property Management, Inc., an entity controlled by Murray Liebowitz, shall enter into a Management Agreement (a copy of which is appended to the Memorandum as Exhibit "B"), wherein M.L. Property Management, Inc. shall receive a management fee equal to five (5%) percent of the gross receipts from the ownership and operation of the Property actually received by the Partnership, as more fully provided for in the Management Agreement.   M.L. Property Management, Inc. shall act as managing agent of the Property pursuant to the Property Management Agreement, and in such capacity shall perform on behalf of the Partnership all services customarily performed by a property management company, in accordance with sound management practices.

-51-

6.2   **Partnership Expenses.**   Except as herein otherwise provided, the Partnership shall be responsible for paying all direct costs and expenses of holding, owning, developing and operating the Property, including, without limitation, debt service; compensation of M.L. Property Management, Inc., as managing agent; cost of utilities, supplies, insurance premiums, taxes, advertising expenses, bookkeeping and accounting directly related to the Property; legal expenses; office supplies; and all other fees, costs and expenses directly attributable to the operation of the Property and the Partnership.   In the event any such costs and expenses are or have been advanced by a Partner on behalf of the Partnership, then except as expressly provided herein to the contrary, such Partner shall be entitled to be reimbursed for such payment pursuant to Section 7.1 of this Agreement, so long as payment is reasonably necessary for Partnership business and is reasonable in amount.

6.3 **Replacement Reserve Account.**   The General Partners may establish a replacement reserve account (the "Replacement Reserve Account") and may deposit therein from time to time such amounts from revenues from operations before any other distributions under Section 5 as they shall determine in their sole discretion to be appropriate   The Replacement Reserve Account may be charged with any expenditures for the acquisition, repair or construction of items which are treated as capital expenditures (as opposed to expense deductions) under generally accepted accounting principles.   Nothing contained in this Section 6.3 shall in any way limit or restrict the right of the General Partners to use

other assets of the Partnership (other than deposits to the

construction of items which are treated as capital expenditures
under generally accepted accounting principles.

### SECTION 7

### LOANS AND ADDITIONAL CAPITAL CONTRIBUTIONS
### TO THE PARTNERSHIP

7.1 **Optional Loans.** From time to time any Partner may make
optional loans to the Partnership or advance money on its behalf.
Such loans or advances shall bear interest at the Prime Rate, and
shall be payable as determined by the General Partners.  The
amount of any such loan or advance, and interest thereon, shall
be deemed an obligation of indebtedness from the Partnership to
the Partner making such loans or advances.

7.2 **Additional Capital Contributions**  No Partner shall be
required to make any additional capital contribution, except as
may be set forth in paragraph 7.2.2.

7.2.1.  **Call for Funds.**  The Partners recognize that
the income produced by the Partnership activities in the
operation of the Property may be insufficient for the proper
maintenance and operation of the Property.  If, in the judgment
of the General Partners, additional funds are required by the
Partnership for the construction, completion, maintenance,
preservation or operation of the Property, such additional funds
shall be called for by the General Partner on written notice to
the Partners specifying the amounts and purposes of any such
additional contributions.  Such funds may be contributed by the

-53-

their respective allocations set forth in Section 2.6 of this Agreement, in cash, within ten (10) business days after receipt of such notice from the General Partners.

7.2.2   **Contributions by Partners.**   If the Partnership requires additional capital, the additional capital contributions shall be sought by the General Partners in the manner prioritized as follows:

(a)   First, each Partner shall have the option to contribute a portion of the required additional capital in the same percentage to the total additional capital as his or her original capital contribution bears to the original capital contribution of all Partners.   For example, if a Partner contributed thirty (30%) percent of the original capital contribution, then that Partner shall have the option to make an additional capital contribution of thirty (30%) percent of the total additional capital amount.

(b)   Second, to the extent that any Partner does not elect to contribute that portion of the required additional capital as his or her original capital contribution bears to the original capital contribution of all Partners, then, in that event, such Partner that has elected to voluntarily contribute that portion of the required additional capital pursuant to Section 7.2.1 above, shall have the option to contribute additional capital in excess of the percentage contributed by that Partner in the original capital contribution.   For example, if a Partner contributed thirty (30%) percent of the original

-54-

capital contribution, and such Partner has voluntarily agreed to contribute the equivalent of thirty (30%) percent of the additional capital contribution, then, in the event another Partner does not volunteer his or her pro rate partner percentage share, then, in that event, the Partner who voluntarily contributed thirty (30%) percent of the additional capital may voluntarily contribute any amount in addition to the thirty (30%) percent additional capital contribution, on a pari passu basis with those other Partners willing to make additional voluntary capital contribution, on a pari passu basis with those other Partners willing to make additional voluntary capital contributions.

(c)   Third, to the extent that any Partner does not elect to contribute that portion of the required additional capital as his or her original capital contribution bears to the original capital contribution of all Partners, then, in that event, such Partner that has not elected to voluntarily contribute that minimum portion of the required additional capital pursuant to Section 7.2.1 above, shall have the option to contribute additional capital in an amount less than the minimum percentage contributed by that Partner in the original capital contribution. For example, if a Partner contributed thirty (30%) percent of the original capital contribution, and such Partner has not voluntarily agreed to contribute the equivalent of thirty (30%) percent of the additional capital contribution, then, in

additional capital in an amount less than thirty (30%) percent of the additional capital contribution.

(d) Fourth, in the event the amount of additional capital contributed by the Partners in accordance with the prioritized provisions of this Section as set forth above, does not result in the total amount of additional capital needed, but instead results in a total amount of additional capital which is less than the needed amount as determined by the General Partners, then, in that amount, the General Partners may seek additional capital contributions from third parties such as outside lenders, or by the admission of New Partners to the Partnership.

7.2.3   **Contributions for Non-Contributing Partners** (**"Non-Contributing Partners"**).   If any Partner fails or refuses to make any or all of his proportionate share of any needed additional capital contribution as set forth in Paragraphs 7.2.1 and 7.2.2 above, and the other Contributing Partners do not choose to make voluntary contributions of additional capital as provided in paragraph 7.2.2 above, then each Contributing Partner shall have the primary right to advance to the Partnership that portion of such excess which the proportion of each Partner's percentage of such additional capital contributions bears to the aggregate of the additional contributions of all Partners, and a secondary right to advance any remaining portion of such excess which is not desired to be advanced by any other Partner in the exercise of such Partner's primary right (hereinafter, such

-56-

"Contributing Partner Contributions"). If there is more than one Contributing Partner desiring to exercise secondary rights, each of such Contributing Partners shall be entitled to advance the remaining portion of such excess in the same proportion as stated above with regard to their respective primary rights.

7.2.4 **Loss of Partnership Interest by Non-Contributing Partner.** In the event a Non-Contributing Partner shall fail to make his proportionate additional capital contribution, as provided under Sections 7.2.1 *et seq.*, and in the further event that the Contributing Partners shall make contributions on behalf of the Non-Contributing Partners pursuant to Section 7.2.3 above, then in such event, the Non-Contributing Partner's Partnership interest shall be reduced (and the Contributing Partner(s) Partnership interest shall be increased) for all purposes under this Agreement. The above reduction and corresponding increase shall be determined by the following formula:

$$\frac{\text{Total capital contribution paid by the Non-Contributing Partner as of the date of Default}}{\text{(Total capital contribution paid)} + \text{(2x Default amount)}} \quad X \quad \begin{array}{l}\text{Percentage ownership} \\ \text{interest in Partnership} \\ \text{of Non-Contributing} \\ \text{Partner immediately prior} \\ \text{to computation}\end{array}$$

= New percentage ownership interest of the Non-Contributing Partner in the Partnership

The total percentage reduction in the Non-Contributing Partner's interest as determined by the formula set forth above shall then be allocated to the Contributing Partner(s).

-57-

Existing Partners of the Partnership, at any time, fail or refuse to make required or needed additional Capital Contributions, then, and in that event the General Partners, in their sole discretion, shall have the right to admit to the Partnership New Additional Partners. The New Additional Partners shall be bound by and have the benefit of the within Agreement and any new capital contributed by any New Additional Partner shall be specifically entitled to the dilution privileges and priority privileges as provided by the within Agreement, including but not limited to, the provisions of Sections 7.2.3 et seq.

7.2.6 **New Partners**. New Partners shall only be permitted to gain admission to the Partnership by the vote of two-thirds (2/3rds) of the Partnership Interest of the Contributing Partners only. Non-Contributing Partners shall not be permitted to vote on the admission to the Partnership of New Partners. For purposes of this Subsection 7.2.6 as it relates to voting on the admission of New Partners to the Partnership, Contributing Partners permitted to vote shall be those Partners contributing to the specific request for Additional Capital Contribution which gave rise to the need for New Partners.

7.2.7 **Miscellaneous**. In the event that the amount of additional capital contribution collected by the General Partners from any Partner is not in equal proportion to the Partner(s) percentage of the total original capital contribution of said Partner(s), then, in that event, except as otherwise provided in Section 10 hereof (Dissolution and Winding Up), net cash from

sales or refinancings shall be distributed, at such times as the General Partners may determine, in the following order and priority:

(i)   First, to the mortgage holders and other Partnership creditors, and third parties, such as outside lenders, in an amount equal to their respective obligations;

(ii)  Second, to the Partner(s), Interest Holders and third parties who contribute additional capital, an amount of the equity interest of the Partner(s) not contributing additional capital (which equity interest shall be diluted on a two to one basis) and shared by the Partner(s), Interest Holders and third parties who contribute additional capital, in proportion to the amount of their respective additional capital contributions;

(iii) To the extent that any Partner(s), Interest Holders and third parties contribute additional capital, the Partner(s), Interest Holders and third parties shall receive a first priority return for the additional capital contribution plus interest at the rate of fifteen (15%) percent per annum, and the additional capital contributions, plus accrued interest, shall be repaid by the General Partners prior to the payment of any return to any Partner who did not make an additional contribution, and provided further, that, in the event more than one additional contribution is collected, payment on return of the last additional contribution shall have priority over any earlier additional capital contributions with said earlier capital contributions being similarly prioritized based on the date of the additional capital contribution, until the Interest

-59-

the cumulative priority return from the date of any such additional capital contribution to the date such distribution is made; and

(iv) The balance, if any, to the Interest Holders and Partner(s) in accordance with Section 5 (Distributions).

7.2.8. <u>Transferee Partners</u>. Any Partner who shall acquire the interest of any other Partner shall, with respet to the interest so acquired, be deemed to be a Partner of the same class as his transferor.

## SECTION 8

## SALE OF THE PROPERTY

8.1 <u>General.</u> The sale or other disposition of all or substantially all of the assets of the Partnership ("Sale") shall require a vote of Partners owning at least two-thirds (2/3rds) of the total Partnership interests in the Partnership.

In the event of a contemplated sale, the General Partners shall provide a Notice of Contemplated Sale ("NCS") to each of the Partners. The NCS may provide for a range of sale prices or other salient terms of the proposed listing of the Property; however, in any and all events, the NCS shall contain a Minimum Gross Prospective Sale Price, (defined as gross proceeds of sale after all selling expenses but before payment of any outstanding mortgages(s)).

8.2 <u>Sale Based On Votes Of Partners Owning One-Half (1/2) or More But Less Than Two-Thirds (2/3ds) Of Total Partnership Interest In Partnership.</u> In the event that Partners owning one-

-60-

half (1/2) or more but less than two-thirds (2/3rds) of the total Partnership interests in the Partnership vote in favor of the Sale, then, and in that event, the Partners who do not vote in favor of the sale ("Sale Refusal Partners") shall be required to acquire the Partnership Interest of those partners who vote in favor of the Sale ("Selling Partners") in accordance with the following procedure:

(a) First, each Partner shall be advised by written notice ("Sale Notice") from the General Partners of the results of the vote; and each Sale Refusal Partner shall have ten (10) business days from receipt of the Sale Notice within which to provide the General Partners with written notice of a change in vote in favor of the Sale ("Change in Vote Notice"). In the event, the General Partners receive sufficient Change in Vote Notices to result in the affirmative vote for sale of Partners owning at least two-thirds (2/3rds) of the total Partnership interests in the Partnership, then, in that event, the Sale shall proceed in accordance with Subsection 8.1 of this Agreement. For purposes of this Subsection 8.2(a) lack of receipt by the General Partners of any written response from a Sale Refusal Partner shall be deemed a Change in Vote and such Sale Refusal Partner shall thereby be deemed to have approved the Sale, and become a Selling Partner.

However, in the event that one-half or more, but less than two-thirds (2/3rds) of the total Partnership Interest remain as Selling Partners, and the Sale Refusal Partner(s) submit(s) written Notice to the General Partners that said Sale Refusal

Partner(s) still remain(s) opposed to the Sale, then, and in that event, each such Sale Refusal Partner shall be required to purchase and acquire the Partnership Interest of the Selling Partners and to perform in accordance with the procedures set forth under the following Subsections of this Section 8.2:

(b)    The General Partners shall provide each Sale Refusal Partner with a written notice ("Purchase Amount Notice") setting forth the amount of money each Sale Refusal Partner is required to pay to the Selling Partners in order to purchase the entire Partnership Interest of the Selling Partners.    The Purchase Amount Notice shall specify the Total Purchase Amount; the amount of moneys required from each of the Sale Refusal Partners.    The "Total Purchase Amount" shall be defined to mean the Minimum Gross Prospective Sales Price less any and all existing mortgages of record against the subject premises ("Total Purchase Amount"), multiplied by the percentage of interest in the Partnership owned by the Selling Partners ("Amount to be paid to the Selling Partners" or "APSP").    The amount of the APSP to be paid by each of the Sale Refusal Partners shall be determined in accordance with a fraction, the numerator of which shall be the percentage of partnership interest of each of the Sale Refusal Partners, and the denominator of which shall be the aggregate percentage of partnership interest of all of the Sale Refusal Partners.

The Total Purchase Amount to be paid by each of the Sale Refusal Partners shall be paid in cash by each of the Sale Refusal Partners to the Counsel for the Partnership, in trust,

-62-

within ten (10) business days after receipt of the Purchase Amount Notice from the General Partners, as provided hereinabove, and shall be distributed by the Counsel for the Partnership to the Selling Partners, in exchange for an assignment of any and all of the right, title and interest of the Selling Partners in the Partnership to the Sale Refusal Partners.

(i)   As an example, but not by way of limitation, if Partners representing 58% of the total partnership interest were to vote in favor of the sale (the "Selling Partners") and 42% of the total partnership interest were to vote in opposition to the sale (the Sale Refusal Partners), then the 42% partners (Sale Refusal Partners) would be required to purchase the 58% partnership interest (the Selling Partners).  Assuming a Minimum Gross Prospective Sales Price of $15,000,000 and an existing mortgage of $11,000,000, the result would be a Total Purchase Amount of $4,000,000 (the "Total Purchase Amount" or "TPA"), which would be multiplied by 58% and would equal $2,320,000 (the "Amount to be Paid to Selling Partners" or "APSP").  To determine the amount of the APSP that each of the Sale Refusal Partners is obligated to pay, the APSP would be multiplied by a fraction, the denominator of which is 42% and the numerator of which would be each of the Sale Refusal Partners percentage of interest in the Partnership immediately prior to the Sale.

For purposes of this subsection, each Partners' capital contribution shall be determined in accordance with this subsection and Section 7, as same relates to any additional contribution that may have been made prior to the Notice of Sale, and all as provided in the within Agreement.

(ii) Second, to the extent that any Sale Refusal Partner elects not to pay the required APSP, and another Sale Refusal Partner elects to voluntarily contribute an additional portion of the required APSP, to make up said shortfall, said Sale Refusal Partner electing to contribute excess monies shall have the option to pay additional monies in excess of the percentage required from that Sale Refusal Partner in the Purchase Amount Notice, and thus acquire a greater interest in the Partnership.

(iii) Third, if any Sale Refusal Partner fails or refuses to make any or all of his proportionate share of the Total Purchase Amount (and no other Sale Refusal Partner elects to contribute as contemplated in (ii) above), then, and in that event, such Sale Refusal Partner shall be deemed to have approved the Sale and the Sale shall proceed in accordance with Subsection 8.1 of this Section if it results in more than 2/3rds of the total Partnerships Interests voting in favor of the Sale or, if less than 2/3rds, it shall proceed in accordance with this Subsection 8.2 with the General Partners sending a revised Sale Purchase Notice to reflect the adjusted Sale Refusal Partner Purchase Amount after the original Sale Refusal Partner who did

not provide the full purchase money

list of Partners voting in favor of the Sale ("Selling Partners").

(c)   Subsections 8.1 and 8.2(a) and 8.2(b) shall be subject to and conditioned upon the approval of any lender holding a Mortgage or other encumbrance, a lien against the subject Property subject to the Sale contemplated by this Section 8 of this Agreement, together with any and all other approvals as may be required by any other written contract or agreement which is binding upon the Partnership (and which prohibits a prepayment of any mortgage or other lien or encumbrance against the Property).

8.3   **Response to Notice of Sale.**  Written response by the Limited Partner(s) to any notice of sale from the General Partners to the Limited Partner(s) shall be sent to the General Partners within ten (10) business days of receipt of the notice by the Limited Partner(s) and any failure to respond in writing within ten (10) business days from receipt of such notice shall be deemed an approval of sale by the said Limited Partner(s).

## SECTION 9

### TRANSFER OF INTEREST OF PARTNERS
### OR ADMISSION OF OTHER PARTNERS

9.1   **Method of Transfer.**  No transfer of all or part of a Partner's Unit(s) or interest in the Partnership may be effected except as permitted in this Section 9, and then only if a counterpart of the instrument of Transfer, executed and

...knowledged by ... Partnership. A permitted Transfer shall be effective as of the date specified in the instrument related thereto.

9.2 Transfers by Partners. (a) Except as provided in Section 10 and this Section 9, the General Partners shall not Transfer any part or all of their Partnership interest, and no Limited Partner shall Transfer any part or all of his Interest, except as hereinafter provided, and then only if the transferee is either a citizen or resident of the United States. The foregoing prohibitions shall not apply to the following:

## As to the General Partners

(i) any transfer by a General Partner to an Affiliate or a transfer by a General Partner on account of bankruptcy or dissolution of such General Partner or any pledge of its Partnership interest by the General Partner to secure a loan to the General Partner or guaranteed by the General Partner; provided, however, that (a) without the written consent of the Limited Partners owning a majority of the Interest in the Partnership, no such person shall become a Substitute General Partner of the Partnership, and (b) without the written consent of the Limited Partners owning at least a majority of the Units of the Partnership, which consent shall not be unreasonably withheld, no assignment by a General Partner of its interest as a General Partner shall relieve such Partner of any liability hereunder.

<u>As to the Limited Partner</u>

(ii)  any transfer of the Partnership interest of a deceased, incompetent, insolvent, bankrupt or dissolved Limited Partner to his executors, administrators or legal representatives or by any of such persons to accomplish any Transfer described under Subsection (b) above (as used in this Section 9, "transferee" shall include such persons); provided, however, that (I) the effectiveness of any of the aforesaid transactions may be conditions, in the discretion of the General Partner, upon receipt by the Partnership of a legal opinion (the cost of which shall be borne by the transferor), satisfactory in form and substance to the General Partner, to the effect that such transaction will not violate the Act or any other applicable securities laws, (ii) no Transfer shall be permitted if, in the reasonable opinion of counsel to the Partnership (which may be secured by the General Partner, in its discretion, at the expense of the Partnership), the Partnership's continued tax status as a partnership for federal income tax purposes would be jeopardized by such a Transfer, (iii) no Transfer shall be permitted without the consent of the General Partner if the Transfer would result in the "termination" of the Partnership pursuant to Section 708 of the Code.

9.3    <u>Rights of Transferee.</u>  No transferee of the Partnership interest of a Partner shall have the right to become a Substitute Partner, unless:

(a)  his transferor has stated such intention in the instrument of assignment;

(b)     the transferee has executed a document reasonably satisfactory to the General Partners accepting and adopting the terms and provisions of this Agreement;

(c)     the transferor or transferee has paid any reasonable expenses in connection with the admission of the transferee as a Substitute Partner; and

(d)     in the case of an assignee or transferee who is not otherwise a Partner, the General Partners (in their sole, absolute and unfettered discretion) consent to such person becoming a Substitute Partner, which said consent shall not be unreasonably withheld.

9.4     **Section 754 Election.**  In the event of a Transfer of all or part of the Partnership interest of a Limited Partner in the Partnership, and at the request of the transferee, the Partnership may elect (in the General Partners' sole discretion) pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Partnership's assets as provided by Section 734 and 743 of the Code.

9.5     **Profit/Loss Allocations Upon Transfer.**  Unless otherwise agreed between the transferor and the transferee and permitted under applicable law, upon the Transfer of all or any part of the Interest of a Limited Partner as hereinabove provided, the net profits, net losses, net gains and credits attributable to the Interest so transferred shall be allocated between the transferor and the transferee as of the date set forth in the instrument of transfer, and such allocation shall be

of the Partnership that the Interest so transferred was held by each of the transferor and transferee, without regard to the results of the Partnership activities during the period in which each was the holder. Distributions shall be made to the holder of record of the Partnership interest on the date of distribution.

## SECTION 10

## DISSOLUTION AND TERMINATION

10.1  **Events of Dissolution.** Except as provided in Section 10.2, the Partnership shall be dissolved and its business wound up upon the earliest to occur of:

(a)   December 31, 2030;

(b)   with the prior written consent of the Limited Partners owning two-thirds (2/3rds) of the Interest, determining that the Partnership should be dissolved;

(c)   the Partnership becoming insolvent or bankrupt;

(d)   the insolvency, bankruptcy or dissolution of the General Partner; or

(e)   the sale or disposition of all or substantially all of the Partnership's assets, unless the Partnership as a part of the consideration for any such sale or other disposition acquires a note, in which case the Partnership shall be dissolved following the sale by it of its entire interest in such note, or the full collection of the balance thereof.

entity shall be deemed to occur when such entity files a petition in bankruptcy, or voluntarily takes advantage of any bankruptcy, or insolvency law, or is adjudicated a bankrupt, or if a petition or answer is filed proposing the adjudication of such entity as a bankrupt and such entity either consents to the filing thereof or such petition or answer is not discharged or denied prior to the expiration of sixty (60) days from the date of such filing; and the insolvency of an entity shall be deemed to occur when the assets of such entity are sufficient to pay its liabilities and it shall so admit in writing.

    10.2 <u>Continuation of Partnership.</u> The General Partners agree to serve as general partner of the Partnership until the Partnership is terminated. Upon the occurrence of any event set forth in Section 10.1(d) with respect to the General Partner(s), the business of the Partnership shall be continued on the terms and conditions of this Agreement is, within ninety (90) days after such event, Limited Partners owning in the aggregate at least two-thirds (2/3rds) of the Interest in the Partnership shall elect in writing that the business of the Partnership should be continued and shall designate one or more persons to be substituted as General Partner(s). In the event that the Limited Partners elect so to continue the Partnership with a new General Partner(s), such new General Partner(s) shall succeed to all of the powers, privileges and obligations of the General Partner, and the interest in the Partnership of any person or entity no

longer serving as the General Partner shall become a Limited Partner's interest hereunder in the manner provided in Section 9.4

10.3 **Obligations Survive Dissolution**. The dissolution of the Partnership shall not release or relieve any of the parties hereto of their contractual obligations under this Agreement.

10.4 **Distributions Upon Dissolution.** Upon any dissolution requiring the winding up of the business of the Partnership all or part of the assets, as determined by the General Partners or such other person as is winding up the business of the Partnership, shall be sold and the proceeds thereof distributed and/or the remaining assets distributed as provided in Section 5.1(c) hereof.

## SECTION 11

## DEATH OR INSANITY OF A LIMITED PARTNER

11.1 **Death.** In the event of the death of a Limited Partner, the executor, administrator, or other legal representative of the deceased Limited Partner shall succeed to the rights of such deceased Limited Partner to receive allocations and distributions hereunder, and may be admitted in the Partnership as a Limited Partner, in the place and stead of the deceased Limited Partner in accordance with Section 9. Any Transfer by such executor, administrator or legal representative of the deceased Limited Partner shall be governed by the provisions of Section 9.

11.2   **Insanity.**   In the event of the incompetency or insanity of a Limited Partner, the guardian or other legal representative of the insane or incompetent Limited Partner shall succeed to the rights of such Limited Partner to receive allocations and distributions hereunder, and may be admitted into the Partnership as a Limited Partner in the place and stead of the insane or incompetent Limited Partner in accordance with Section 9.   Any Transfer by such guardian or other legal representative of all or any part of the Partnership interest of the insane or incompetent Limited Partner shall be governed by the provisions of Section 9.

**SECTION 12**

**ACCOUNTING**

12.1   **Fiscal Year.**   The fiscal year of the Partnership shall be the calendar year.

12.2   **Books, Records and Accounting Method.**   The General Partners shall keep, or cause to be kept, full and accurate records of all transactions of the Partnership in accordance with the principles and practices generally accepted for the accrual method of accounting (the Partnership may adopt the cash method of accounting at any time upon the written determination to do so by the General Partners).

12.3   **Location of Books and Records.**   Unless otherwise changed by the General Partners, all such books of account shall, at all times, be maintained in the principal place of business of the Partnership.   Such principal office shall be open during reasonable business hours for the reasonable inspection and

-72-

examination by the Limited Partners and their authorized representatives of such books of account, which parties shall have the right to make copies thereof.

12.4  **Federal Tax Returns.**  The General Partners shall prepare, or cause to be prepared, a federal information tax return in compliance with the Code, and any required state and local tax returns for the Partnership for each tax year of the Partnership; and, in connection therewith, shall made any available or necessary elections, including elections with respect to the useful lives of the properties of the Partnership and the rates of depreciation on such properties.

## SECTION 13

## REPORTS AND STATEMENTS

13.1  **Tax Return Information.**  By the tenth (10th) day of April of the fiscal year of the Partnership, the General Partners, at the expense of the Partnership, shall cause to be delivered to the Limited Partners such information as shall be necessary (including a statement for that year of the Limited Partner's share of net income, net gains, net losses and other items of the Partnership) for the preparation by the Limited Partners of their federal, state and local income and other tax returns.

13.2  **Financial Statements.**  Within one hundred (100) days after the end of each fiscal year of the Partnership, the General Partners shall cause to be delivered to the Limited Partners a financial statement of the Partnership for such fiscal year, prepared at the expense of the Partnership, prepared by an

independent certified public accountant) which enclosed statement shall set forth, as of the end of and for such fiscal year, the following:

(a) a profit and loss statement and a balance sheet of the Partnership;

(b) the balance in the capital account of each Partner; and

(c) such other information as, in the judgment of the General Partners, shall be reasonably necessary for the Partners to be advised of the financial status and results of operations of the Partnership.

## SECTION 14

## BANK ACCOUNTS

**14.1 General.** The General Partners shall open and maintain (in the name of the Partnership) a bank account or accounts in a bank or savings and loan association, the deposits of which are insured by an agency of the United States government, in which shall be deposited all funds of the Partnership. Withdrawals from such account or accounts shall be made upon the signature or signatures of such person or persons as the General Partners shall designate. There shall be no commingling of the assets of the Partnership with the assets of any other entity or person.

## SECTION 15

## POWER OF ATTORNEY

**15.1 General.** The Limited Partners give to the General Partners, the power of attorney contained in this Section and constitute and appoint the General Partners, with full power of

-74-

substitution and resubstitution, as their attorney-in-fact with full power and authority to act in their name on their behalf with respect to the execution, acknowledgment, swearing to and filing of the following documents, subject to all of the provisions of this Agreement:

(a)   This Agreement or a separate Certificate of Limited Partnership which is to be filed in the appropriate public offices in the State of Florida to preserve the character of the Partnership as a limited partnership and any amendment to this Agreement or said Certificate which is necessary to be filed;

(b)   Any instrument which the General Partners deem to be in the best interests of the Partnership to file and which is not inconsistent with this Agreement;

(c)   Any documents which may be required to effect any amendment to this Agreement for any continuation, dissolution, or termination of the Partnership which is in accordance with the terms hereof;

(d)   Any signature pages which, when executed by a Limited Partner, will become a counterpart of this Agreement, as authorized under Section 20.1 hereof;

(e)   Any documents, certificates or other instruments, including deeds, mortgages or security agreements encumbering property of the Partnership to secure debt of the Partnership; and

(f)   Any documents, certificates or other instruments which the General Partners are authorized to execute pursuant to the powers granted in Section 3.2 of this Agreement.

15.2   **A Special Power; Manner of Exercise; Survival.**   The power of attorney hereby granted by the Limited Partners and the Withdrawing Limited Partners to the General Partners:

(a)   is a special power of attorney coupled with an interest, which is irrevocable and shall survive the death or incapacity of the Limited Partner(s);

(b)   may be exercised by the General Partners, either by signing separately as attorney-in-fact for each Limited Partner, or, after listing all of the Limited Partners or executing any instrument, by a single signature of the General Partners, acting as attorney-in-fact for all of the Limited Partners; and,

(c)   shall survive the delivery of an assignment by the Limited Partner(s) of the whole or any portion of their interest except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a Substitute Limited Partner, this power of attorney given by the Assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partners to execute, acknowledge, swear to and file any instrument necessary to effect such substitution.

15.3   **Limitations.**   No document or amendment executed by the General Partners pursuant to this Section 15 shall, in the absence of the prior consent of the Limited Partners, (i) reduce

-76-

the obligations

or restrictions regarding the assignability of the Unit(s); (iii) modify the terms of the Partnership; (iv) amend this Section 15; or (v) reduce the rights or interests or enlarge the obligations of the Limited Partners.   The General Partners shall promptly notify the Limited Partners of any documents or amendments affecting them executed pursuant to this Section 15.

## SECTION 16

### NOTICES

16.1  **General.**  Whenever any notice is required or permitted to be given under any provision of this Agreement, such notice shall be in writing, signed by or on behalf of the person giving the notice, and shall be deemed to have been given on the earlier to occur of (i) actual delivery or (ii) when mailed by certified mail, postage prepaid, return receipt requested, addressed to the person or persons to whom such notice is to be given as follows (or at such other address as shall be stated in a notice similarly given):

(a) such notice shall be given to the General Partners, at the principal place of business of the Partners;

(b) if the Limited Partners, such notice shall be given to the Limited Partners at their respective addresses indicated on Schedule "Al" attached hereto;

(c) a copy of such notice shall be given to the Counsel for the Partnership, Lawrence E. Bathgate II, Esquire, Bathgate, Wegener, Dugan & Wolf, P.C., One Airport Road, Lakewood, New Jersey 08701;

-77-

(d)   a copy of such Notice shall be given to

Accountant for the Partnership, Robert Krim, Cranberry Commons,
Building C, 446 State Highway #35, Eatontown, New Jersey  07724;
and

(e)  whenever any written notice is given in accordance
with this Section 16.1 to a Limited Partner, the failure of any
Limited Partner to respond to said Notice in writing within ten
(10) business days of receipt of said Notice shall be deemed an
approval and consent of said Limited Partner to the proposal set
forth in said Notice.   The only action which shall be deemed a
disapproval or a vote in opposition by the Limited Partner to any
contemplated action by the Partnership and/or the General
Partners shall be a written response expressly stating such
disapproval or opposition from the Limited Partner to the General
Partners within ten (10) business days of the receipt of the
Notice.

## SECTION 17

### BINDING EFFECT

- 17.1  <u>General.</u>  Except as herein otherwise provided to the
contrary, this Agreement shall be binding upon and inure to the
benefit of the parties hereto, their heirs, personal
representatives, successors and assigns.

## SECTION 18

### AMENDMENTS

18.1  <u>General.</u>  No amendment, modification or waiver of this
Agreement, or any part hereof, shall be valid or effective unless
in writing and signed by the General Partners and by the Limited

Partners owning in the aggregate at least two-thirds (2/3) of the interest of the Partnership; and no waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other condition or subsequent breach, whether of like or different nature. Notwithstanding the above, this Agreement may be amended without the prior agreement of the Limited Partners whenever required by law or by this Agreement or necessary to effect changes of a ministerial nature which do not adversely affect the rights or increase the obligations of the Limited Partners, including, without limitation, changes in Partners or their addresses, the admission of Limited Partners and the addition of Substitute Limited or New Additional Partners.

## SECTION 19

### APPLICABLE LAWS

19.1  **General.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

## SECTION 20

### COUNTERPARTS

20.1  **General.**  This Agreement may be executed in several counterparts, and all such counterparts, so executed, taken together shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or the same counterpart.

## SECTION 21

## MISCELLANEOUS

21.1 **Severability.** Each provision hereof is intended to be severable and the invalidity or illegality of any portion of this Agreement shall not affect the validity or legality of the remainder hereof.

21.2 **Captions.** Section and Subsection captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or extend or describe the scope of this Agreement or the intent of any provision hereof.

21.3 **Person and Gender.** The masculine gender shall include the feminine and neuter genders, and the singular shall include the plural.

21.4 **Miscellaneous.** The General Partners are authorized to perform the ministerial duty of qualifying this Partnership under the laws of any state in which it is necessary to file documents or instruments of qualification. A Partnership office or principal place of business in any state may be designated from time to time by the General Partners.

IN WITNESS WHEREOF, the parties hereto have subscribed and sworn to this Certificate and Agreement of Limited Partnership as of the day and year first above written.

HARBOR INN OF CS ASSOCIATES, LTD.

GENERAL PARTNERS

ATTEST:                          M.L. PROPERTY MANAGEMENT, INC.

_____          By: _____
SHELDON LIEBOWITZ, Secty.            MURRAY LIEBOWITZ, PRESIDENT

ATTEST:                          CDS INDUSTRIES, INC.

_____          By: _____
PAUL MARCUS, Secretary               PAUL MARCUS, PRESIDENT

WITNESS:                         LIMITED PARTNERS

_____          _____
                                 PAUL MARCUS

_____          _____
                                 DANI SIEGEL

_____          _____
                                 ADRIAN VAN ZON

_____          _____
                                 GLEN PARKER

_____          _____
                                 NORMAN FOSBACK

_____          _____
                                 MURRAY LIEBOWITZ

_____          _____
                                 SHELDON LIEBOWITZ

_____          _____
                                 JERRY HOFFMAN, TRUSTEE FOR
                                 JOAN OSIAS HOFFMAN TRUST UNDER DATE 5/15/84

_____          _____
                                 JOAN HOFFMAN, TRUSTEE FOR
                                 JOAN OSIAS HOFFMAN TRUST UNDER DATE 5/15/84

EXHIBIT A1
Page 1 of 2

General Partners

|  | Unit(s) | %Interests-CapitalContribution (Amount of Cash/Agreed Value) |
|---|---|---|
| R.L.Property Management,Inc. c/o Murray Liebowitz 2600 E. Commercial Boulevard Suite 213 Ft. Lauderdale, Florida 33308 | 1/2 | 1/2%(.5%)   $        0* No initial capital contribution but required to pay any additional contribution |
| CDS Industries, Inc. c/o Paul Marcus 2600 E. Commercial Boulevard Suite 213 Ft. Lauderdale, Florida 33308 | 1/2 | 1/2%(.5%)   $        0* No initial capital contribution but required to pay any additional contribution |

*The initial capital contribution waiver is in consideration for agreement to serve as general partners and incur liability related thereto.

Limited Partners

|  | Unit(s) | %Interests-CapitalContribution** (Amount of Cash/Agreed Value) |
|---|---|---|
| Paul Marcus 864 East 25th Street Paterson, NJ   07513 | 45 | 44.55%   $  900,000.00 |
| Dani Siegel Genetra Affiliates, Inc. 39 W. 56th Street New York, NJ   10019 | 20 | 19.80%     400,000.00 |

## EXHIBIT A1
## Page 2 Of 2

## Limited Partners cont'd.

| | Unit(s) | %Interests-CapitalContribution** (Amount of Cash/Agreed Value) | |
|---|---|---|---|
| Adrian Van Zon<br>Van Zon International<br>555 West 57th Street<br>New York, New York  10019 | 10 | 9.90% | 200,000.00 |
| Glen Parker<br>The Institute for<br>Economic Research<br>3471 N. Federal Highway<br>Ft. Lauderdale, FL  33306 | 5 | 4.95% | 100,000.00 |
| Norman Fosback<br>2600 N.E. 39th Avenue<br>Ft. Lauderdale, FL  33306 | 5 | 4.95% | 100,000.00 |
| Murray Liebowitz<br>c/oM.L.Property Management,Inc.<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, FL  33308 | 5 | 4.95% | 100,000.00 |
| Sheldon Liebowitz<br>c/oM.L.Property Management,Inc.<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 5 | 4.95% | 100,000.00 |
| Drs. Jerry and Joan Hoffman***<br>***Trustees for<br>Joan Osias Hoffman Trust<br>dated May 15, 1984<br>10 Compass Lane<br>Ft. Lauderdale, FL  33308 | 5 | 4.95% | 100,000.00 |
| Total: | 101 | 100% | $2,000,000.00 |

**Limited Partners representing 99% of the capital interest contributed 100% of the initial capital contribution of $2,000,000.00.

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: _3|29|93_                    _____
                                        (signature)

MAILING ADDRESS:

_16 BAYBERRY Dr._           _PAUL MARCUS_
_STONE RIVER, N.J_              (Please Print Name)

STATE OF            )

COUNTY OF           )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _PAUL MARCUS_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _29th_ day of ___March___, 1993.

                              _____
                              Notary Public
                              My Commission Expires:
                              JAMES K. BARRY
                              NOTARY PUBLIC OF NEW JERSEY
                              MY COMMISSION EXPIRES DEC. 13, 1993

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

_____
(signature)

MAILING ADDRESS:

_____

_____

Murray Liebowitz
(Please Print Name)

STATE OF Florida )
COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Murray Liebowitz to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this 30th day of March, 1993.

_____
Notary Public
My Commission Expires

MARGARET R. SMITH
MY COMMISSION EXPIRES
JULY 17, 1996
#CC 207994
NOTARY PUBLIC, STATE OF FLORIDA

CSP-29

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93

_____
(signature)

MAILING ADDRESS:

_____

_____
(Please Print Name)

STATE OF Florida )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared Sheldon Liebowitz to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this 29th day of March , 1993.

_____
Notary Public
My Commission Expires:

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93 _____       _Joan O Hoffman_
                                (signature)

MAILING ADDRESS:

_10 Compass Lane_
_Ft Lauderdale, Fl. 33308_

                                _Joan O. Hoffman_
                                (Please Print Name)

STATE OF Florida )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _Joan Hoffman_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _2nd_ day of _March_, 1993.

                                _Margaret R Smith_
                                Notary Public
                                My Commission Expires

MARGARET R. SMITH
MY COMMISSION EXPIRES
JULY 17, 1996
#CC 207994
NOTARY PUBLIC, STATE OF FLORIDA

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/29/93 _____

_____
(Signature)

MAILING ADDRESS:

_Compass Lane_____          _Jerome J. Hoffman, M.D._
                               (Please Print Name)
_Ft Lauderdale, Florida 33308

STATE OF Florida )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared _Jerome J. Hoffman_ to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State
last aforesaid this _26th_ day of _March_, 1993.

_____
Notary Public
My Commission Expires:

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: 3/25/93
_Norman G Fosback_
(Signature)

MAILING ADDRESS:
00 N. E. 30th Ave.
land, FL 33306

_Norman G. Fosback_
(Please Print Name)

STATE OF Florida )

COUNTY OF Broward )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _Norman G. Fosback_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this 25 day of _March_, 1993.

_Joan M. Appel_
Notary Public
My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP. OCT. 25,1995
BONDED THRU GENERAL INS. UND.

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private Placement Memorandum relating to the placement of units in Harbor Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of the Amended and Restated Certificate and Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd.

DATE: ___March 26, 1993___

_____
(signature)

MAILING ADDRESS:

_____

_____

_____
(Please Print Name)

STATE OF *New York* )

COUNTY OF *New York* )

I HEREBY CERTIFY that on this day, before me an officer duly authorized in the State aforesaid and in the County aforesaid, to take acknowledgments, personally appeared _DANI SIEGEL_ to me known to be the person described in and who executed the foregoing instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State last aforesaid this _26TH_ day of ___MARCH___, 1993.

_____
Notary Public
My Commission Expires:

DAVID J. SOCCI
Notary Public, State of New York
No. 43-4741386
Qualified Richmond County
Commission Expires *8/31/93*

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: _3/29/93_ _____
(signature)

MAILING ADDRESS:

_998 Spinnaker Ach Dr._  _A. Van Zon_
(Please Print Name)
_Ponte Vedra Bch, FL_
_32082_

STATE OF _New York_,
COUNTY OF _Queens_,

I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared _Adrian van Zon_ to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

WITNESS, my hand and official seal in the County and State
last aforesaid this _29th_ day of _March_ , 1993.

ALTHEA HENRY
Notary Public, State of New York
No.41-4768459
Qualified in Queens County
Commission Expires March 30, 1993

_____
Notary Public
My Commission Expires:

COUNTERPART SIGNATURE PAGE FOR AMENDED AND RESTATED CERTIFICATE
AND AGREEMENT OF LIMITED PARTNERSHIP

The undersigned, having received a Confidential Private
Placement Memorandum relating to the placement of units in Harbor
Inn of CS Associates, Ltd. (the "Partnership"), hereby agrees to
become a Limited Partner in the Partnership.

This Signature Page will be attached to and become a part of
the Amended and Restated Certificate and Agreement of Limited
Partnership of Harbor Inn of CS Associates, Ltd.

DATE: _3/25/93_____          _Glen King Parker_____
                                 (signature)

MAILING ADDRESS:

_1855 NE 25 Ct._____          _Glen King Parker_____
_Ft. Lauderdale FL 33305_        (Please Print Name)

STATE OF _Florida_      )

COUNTY OF _Broward_ )

    · I HEREBY CERTIFY that on this day, before me an officer
duly authorized in the State aforesaid and in the County aforesaid,
to take acknowledgments, personally appeared _Glen King Parker_ to me
known to be the person described in and who executed the foregoing
instrument and he acknowledged before me that he executed same.

    WITNESS, my hand and official seal in the County and State
last aforesaid this _25_ day of _March_____, 1993.

                          _Jean M. Appel_____
                          Notary Public
                          My Commission Expires:

                          NOTARY PUBLIC STATE OF FLORIDA
                          MY COMMISSION EXP. OCT. 23,1993
                          BONDED THRU GENERAL INS. UND.

### EXHIBIT Al
### Page 1 of 2

## General Partners

| | Unit(s) | %Interests-CapitalContribution (Amount ofCash/Agreed Value) |
|---|---|---|
| M.L.Property Management,Inc.<br>c/o Murray Liebowitz<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 1/2 | 1/2%(.5%)    $        0*<br>No initial capital<br>contribution but<br>required to pay any<br>additional contribution |
| CDS Industries, Inc.<br>c/o Paul Marcus<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 1/2 | 1/2%(.5%)    $        0*<br>No initial capital<br>contribution but<br>required to pay any<br>additional contribution |

*The initial capital contribution waiver is in consideration for agreement to serve as general partners and incur liability related thereto.

## Limited Partners

| | Unit(s) | %Interests-CapitalContribution** (Amount of Cash/Agreed Value) |
|---|---|---|
| Paul Marcus<br>864 East 25th Street<br>Paterson, NJ   07513 | 45 | 44.55%    $  900,000.00 |
| Dani Siegel<br>Genetra Affiliates, Inc.<br>29 W. 56th Street<br>New York, NJ   10019 | 20 | 19.80%        400,000.00 |

## EXHIBIT A1
## Page 2 Of 2

## Limited Partners cont'd.

| | Unit(s) | %Interests–CapitalContribution** (Amount of Cash/Agreed Value) | |
|---|---|---|---|
| Adrian Van Zon<br>Van Zon International<br>355 West 57th Street<br>New York, New York  10019 | 10 | 9.90% | 200,000.00 |
| Glen Parker<br>The Institute for<br>Economic Research<br>3471 N. Federal Highway<br>Ft. Lauderdale, FL  33306 | 5 | 4.95% | 100,000.00 |
| Norman Fosback<br>3600 N.E. 39th Avenue<br>Ft. Lauderdale, FL  33306 | 5 | 4.95% | 100,000.00 |
| Murray Liebowitz<br>c/oM.L.Property Management,Inc.<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, FL  33308 | 5 | 4.95% | 100,000.00 |
| Sheldon Liebowitz<br>c/oM.L.Property Management,Inc.<br>2600 E. Commercial Boulevard<br>Suite 213<br>Ft. Lauderdale, Florida 33308 | 5 | 4.95% | 100,000.00 |
| Drs. Jerry and Joan Hoffman***<br>***Trustees for<br>Joan Osias Hoffman Trust<br>dated May 15, 1984<br>10 Compass Lane<br>Ft. Lauderdale, FL  33308 | 5 | 4.95% | 100,000.00 |
| **Total:** | **101** | **100%** | **$2,000,000.00** |

**Limited Partners representing 99% of the capital interest contributed 100% of the initial capital contribution of $2,000,000.00.

### AMENDMENT TO
### HARBOR INN OF CS ASSOCIATES LTD.
### PARTNERSHIP AGREEMENT

WHEREAS, HARBOR INN OF CS ASSOCIATES LTD. (the "Partnership"), was created pursuant to a Certificate and Agreement of Limited Partnership filed with the Secretary of State of the State of Florida, on March 29, 1993; and

WHEREAS, CDS INDUSTRIES, INC. is a general partner in the Partnership and now desires to transfer its general partnership interest to M.L. PROPERTY MANAGEMENT, INC.; and

WHEREAS, M.L. PROPERTY MANAGEMENT, INC. general partner in the Partnership, desires to consent to the transfer by CDS INDUSTRIES, INC. to M.L. PROPERTY MANAGEMENT, INC. its interest in the Partnership;

NOW THEREFORE, the parties hereto hereby agree, and sign and swear as follows:

1. CDS Industries, Inc. hereby assigns, sets over and transfers its general partnership interest of 1/2 percent (.5%) in the Partnership to M.L. Property Management, Inc. Murray Liebovitz, as President of M.L. Property Management, Inc., by executing this instrument, evidences his intent that M.L. Property Management, Inc. shall become the substituted and sole General Partner, and that it shall have the General Partnership interest set forth in Schedule A.

2. Schedule A to the Agreement and Certificate of Limited Partnership is hereby amended to conform to Schedule A attached hereto.

3. This Amendment to the Certificate and Agreement of Limited Partnership shall take effect on July 1, 1995.

IN WITNESS WHEREOF, the General Partners have executed this Amendment to the Certificate and Agreement of Limited Partnership, this _12th_ day of _July_ , 1995.


_____
WITNESS

_____
WITNESS                                   CDS INDUSTRIES, INC.
                                          Resigning General Partner


                                          By: _____
                                               Paul Marcus, President


1

PL001088

**ASSIGNMENT OF GENERAL PARTNERSHIP INTEREST**

The undersigned, CDS Industries, Inc. and in consideration of $10.00 and other good and valuable consideration, hereby assigns, convey, sets over and transfers its one-half percent (.5%) general partnership interest in Harbor Inn of CS Associates Ltd., a Florida Limited Partnership created pursuant to the Certificate and Agreement of Limited Partnership filed with the Secretary of State of the State of Florida, on March 29, 1993; to M.L. Property Management, Inc., a Florida Corporation, together with all right, title and interest possessed by the undersigned as a General Partner of Harbor Inn of CS Associates Ltd., to have and to hold the same by M.L. Property Management, Inc., its representatives, successors and assigns as of July 1, 1995.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal this ___ day of ___ JULY ___, 1995.

CDS INDUSTRIES, INC.
Resigning General Partner

By: _____ PAUL MARCUS, President

WITNESS

WITNESS

STATE OF _New Jersey_ )
                       ) ss: 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
COUNTY OF _Morris_ )

The foregoing instrument as acknowledged before me this 12th day of ___ July ___, 1995 by PAUL MARCUS who is personally known to me or who has produced _____ as identification and who did take an oath.

_____
Notary Signature

_____
Printed Notary Signature
MY Commission expires January 16, 1999

5

PL001089



ACCEPTANCE OF ASSIGNMENT OF LIMITED PARTNERSHIP INTEREST

The undersigned, M.L. Property Management, Inc. hereby acknowledges the acceptance of the one-half percent (.5%) general partnership interest of Harbor Inn of CS Associates Ltd. from CDS Industries, Inc. and hereby agrees to be bound by the terms and conditions of the Certificate and Agreement of Limited Partnership as filed with and cer' fied by the Secretary of State of Florida on March 29, 1993, together with any and all amendments thereto.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal this _17th_ day of __JULY__, 1995.

                                    M.L. PROPERTY MANAGEMENT, INC.
                                    Accepting General Partner


_____          _____
WITNESS                            By: MURRAY LIEBOWITZ, President


_____
WITNESS


STATE OF __FLORIDA__        )
                           ) ss:
COUNTY OF __BROWARD__       )

The foregoing instrument as acknowledged before me this _17th_ day of __JULY__, 1995 by MURRAY LIEBOWITZ who is personally known to me ~~or who has produced~~ ~~as identification~~ and who did take an oath.


_____
Notary Signature


_Alan J. Werksman_
Printed Notary Signature

Official Seal
ALAN J. WERKSMAN
Notary Public, State of Florida
My Comm. Expires March 28, 1998
No. CC340530
Bonded Thru Service Ins. Inc.

6

PL001090

M.L. PROPERTY MANAGEMENT, INC.
as General Partner

WITNESS

WITNESS

By: _____
Murray Llabouiba, President

M.L. PROPERTY MANAGEMENT, INC.
as Substituted General Partner

WITNESS

WITNESS

By: _____
Murray Llabouiba, President

2

PL001091

| | | | |
|---|---|---|---|
| Deane Marcus<br>24 Cherrywood Court<br>Briarcliff Manor<br>New York, NY | 5 | 4.95 % | |
| Sheldon Liebowitz<br>c/o M.L. Property Mgt. Inc.<br>2600 E. Commercial Blvd. #213<br>Ft. Lauderdale, FL 33308 | 5 | 4.95 % | 100,000 |
| Drs. Jerry & Joan Hoffman<br>Trustees for Joan Osias<br>Hoffman Trust U/T/D 5/15/84<br>10 Compass Lane<br>Ft. Lauderdale, FL 33308 | 5 | 4.95 % | 100,000 |
| **TOTAL** | 101 | 100.0 % | $2,000,000 |

Limited Partners representing 99% of the capital interest
contributed 100% of the initial capital contribution of $2,000,000.

PL001093

**EXHIBIT
2**

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT (the "Agreement") made as of this 31ˢᵗ day of March, 1993, between:

HARBOR INN OF CS ASSOCIATES, LTD.
A Florida Limited Partnership,
2600 E. Commercial Blvd., Suite 213
Fort Lauderdale, Florida 33308
(as "Owner")

AND

M. L. PROPERTY MANAGEMENT, INC.,
A Florida Corporation,
2600 E. Commercial Blvd., Suite 213
Fort Lauderdale, Florida 33308
(as the "Management Company").

### ARTICLE 1

### Establishment of Agency and Renting Responsibility

1.1 **Exclusive Agency.** The Owner hereby appoints the Management Company and the Management Company hereby accepts appointment to manage the property, on the terms and conditions hereinafter provided, as sole and exclusive management agent in connection with renting and operating the apartment complex known as Harbor Inn, located at 801 Harbor Drive, Coral Springs, Florida (the "Property").

1.2 **Owner's Representative.** The Owner shall designate two (2) persons to serve as the "Owner's Representatives" in all dealings with the Management Company hereunder. Whenever the approval or consent or other actions of the Owner is called for hereunder, such approval, consent or action shall be binding on



## ARTICLE 2

2.1    **Expenses of Owner.**    Everything done by the Management Company under the provisions of this Agreement shall be done as the agent of and for the best interests of the Owner, and the Management Company is hereby granted all authority reasonably necessary to carry out the spirit and intent of this Agreement consistent with the best interests of the Owner. Except as otherwise specifically provided in this Article 2, all obligations or expenses incurred by the Management Company hereunder shall be for the account of, on behalf of, and at the expense of the Owner.    The Management Company shall not be obligated to incur any liability or obligation for the account of the Owner without receiving prior assurance that the funds **necessary to discharge such liability or obligation will be provided. Notwithstanding anything to the contrary set forth in** this Agreement, the decision(s) of the Management Company regarding the incurring of any expense or any expenditure of funds may be overridden in any instance at the discretion of the Owner, provided that any such countermand shall be in writing, addressed to the Management Company and signed by the Owner.

2.2    **Employment of Personnel.**    The Management Company shall supervise the hiring, performance and discharge of all personnel employed by the Owner in running the Property in order to properly maintain and operate the Property.    Such personnel shall in every instance be deemed employees of the Owner.    All

-3-

subcontractors, materialmen, suppliers, architects, and engineers

settle any dispute or claim arising therefrom, or behalf of, and in the name of Owner; provided only that the Management Company shall act in good faith and in the best interest of the Owner at all times.   The Management Company will furnish all personnel necessary for proper supervision of the work, and may, without abating any fee payable hereunder, assign personnel located at the Property to such supervisory work.   Owner acknowledges that the Management Company, or an affiliate of the Management Company, may bid on any such work, and that the Management Company, or an affiliate of the Management Company, may be selected to perform part or all of the work; provided that if the Management Company desires to select itself, or its affiliate to do any work, it shall first notify the Owner of the terms upon which it, or its affiliate, proposes to contract for the work, and terms upon which independent contractors have offered to perform, and shall state the reasons for preferring itself, or its affiliate, over independent contractors, and the Owner shall have ten (10) days to disapprove the Management Company, or its affiliate, and to request performance by an independent contractor.   Only the Owner shall have the power to compromise or settle any dispute or claim arising from work performed by the Management Company, or its affiliate; and it is expressly understood that the selection of the Management Company, or its affiliate, will not abate any fee payable hereunder.

-5-

Management Company to reasonably request, demand, collect,

other charges and to reasonably institute legal proceedings (including the hiring of attorneys) in the name of, and at the expense of, the Owner for the collection of such rentals, deposits and other charges due from tenants and for the necessary dispossession of tenants and other persons from the Property. All monies collected by the Management Company shall not be mingled with monies of the Management Company and shall be deposited into a special operating bank account maintained by the Management Company for the Owner, or, in the case of security deposits, into a special security deposit bank account. Said bank accounts shall be in the name of the Owner and only those employees of the Management Company who are covered by employee dishonesty insurance or bonding shall be authorized to handle and draw upon funds. All employee dishonesty insurance shall be in amounts, and obtained from insurers, approved by Owner.

### 2.7 Reports, Reporting and Other Matters.

(a) **Records.** All statements, receipts, invoices, checks, leases, contracts, financial statements, books and records, and all other instruments and documents relating to or arising from the operation or management of the Property shall be maintained by the Management Company, and the Owner and the Management Company shall have the right to inspect and to copy all such matters at all reasonable times, from time to time, during the term of this Agreement and for a reasonable time

-7-

all operational and management functions and requirements of the

expense.

## ARTICLE 3

### Relationship of Management Company to Owner

3.1    <u>Compensation of Management Company.</u>    For the period commencing on the date of this Agreement and so long as the Management Company is acting as manager of the Property pursuant to this Agreement, the Management Company shall receive for its services performed under this Agreement an initial set up fee of five thousand dollars ($5,000.00) plus compensation equal to five percent (5%) of the gross receipts from the ownership and operation of the Property actually received by the Owner (the "Management Fee"), such compensation to be paid monthly in **arrears.   The term "gross receipts" shall not include tenant security deposits (until taken as liquidated damages), prepaid rent (until such rent has accrued), sales tax paid by tenants** (except to the extent of the Owner's allowance, if any, for collecting such taxes), utility expenses paid by tenants, cable television chages paid by tenants (except to the extent of the Owner's portion, if any of such charges), insurance proceeds and returned premiums, condemnation proceeds or payments in lieu thereof, or tax refunds.   The Management Company shall, from the funds collected and deposited, cause to be disbursed regularly and punctually.

-9-

reimbursements which accrued prior to such closing. Within sixty (60) days after any such termination, the Management Company shall deliver to Owner, as required by Section 2.7(b), a statement of cash flow for the quarter year or portion thereof ending on the date of termination. In addition to the foregoing events of termination, this Agreement may be terminated by the Owner for the following causes:

(i) Misfeasance or malfeasance in connection with the performance of the Management Company's duties and responsibilities as provided herein; or

(ii) fraud, embezzlement, breach of trust of or by the Management Company; or

(iii) any felonious act with respect to, or the wilfull and knowing refusal to perform reasonably all or any material portion of, the Management Company's duties hereunder; or

(iv) the filing of any bankruptcy, insolvency, receivership or similar proceeding by or against the Management Company; or

(v) death or disablement of both Sheldon Liebowitz and Murray Liebowitz (the primary principals of the Management Company).

The Owner shall give the Management Company written notice and a reasonable opportunity to cure any default of the Management Company's obligation hereunder.

If to the Management Company:

2600 E. Commercial Blvd.
Suite 213
Fort Lauderdale, Florida 33308

Any party may at any time change its respective address by sending written notice to the other party of the change in the manner hereinabove provided.

3.6 **Miscellaneous.** (a) If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to such person or circumstance (other than those as to which it is held invalid or unenforceable) shall not be affected thereby, and each term and provision of this Agreement **shall be valid and be enforced to the fullest extent permitted by law.**

(b) The failure of the Owner or the Management Company to seek redress for any violation of, or to insist upon the strict performance of, any term or condition of this Agreement shall not prevent a subsequent act by the Owner or the Management Company, which would have originally constituted a violation of this Agreement by the Owner or the Management Company, from having all the force and effect of any original violation. The Owner or the Management Company may restrain any breach or threatened breach by the Owner or the Management Company of any term or condition herein contained, but the mention herein of any

-13-

nondefaulting party, in addition to any other

shall not be obligated) to perform any such duty or fulfill any such obligation of the defaulting party.

(e)   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without reference to the laws of any other State.

(f)   Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture between the Owner and the Management Company or to cause the Management Company to be responsible in any way for the debts or obligations of the Owner or any other person (but nothing contained herein shall affect the Management Company's responsibility to transmit payments for the account of the Owner as provided herein), it being the intention of the parties that the only relationship hereunder is that of principal and agent, and the Management Company will not represent to any one that its relationship to the Owner is other than that set forth herein.

-15-

## ACCEPTANCE OF APPOINTMENT

The undersigned hereby accepts appointment as
the Owner's Representative under the foregoing Management
Agreement. —

Dated this __31__ day of _____, 1993.

_____
Robert Krim

_____
Lawrence E. Bathgate, II

-17-

**EXHIBIT
3**

2600 E. Commercial Blvd.#200
Fort Lauderdale, FL 33308
(954)491-4511 (954)491-4504 Fax
MSL2600@AOL.COM

Paul Marcus
6 Bayberry Drive
Suite B
Saddle River, NJ 07458

August 22nd, 2005

RE:    Sale of Harbor Inn Apartments

Dear Paul:

I am enclosing a package which compares the anticipated results from either selling our rental complex or refinancing and holding for income.

I have contacted only those condo converters that were involved in the bidding for Courts at Kendall and Harbour Island Club. Upon receiving Partners approval from Deane and yourself, I will begin marketing to all of the condo converters active in Broward County. Any potential buyer will find that the property requires new roofs on all of the buildings at a cost of approximately $1,200,000. The potential purchaser who originally offered $40,000,000 is aware of the need for new roofs and after my recent discussion with him, he increased his offer to $43,500,000, including the required non-refundable deposit.

As of today, all of the Partners other than Deane and yourself have signed the Partners Resolution. That total represents 55.45% of the Partnership interest. I hope that you will do so as well.

If you wish to discuss this situation, please call.

With Best Regards,

Murray Liebowitz

CC: Deane Marcus

ENC:  Sales Analysis
         Partners Resolution
         Partners Resolution Copy

HINN7Marcus resolution -22-05



M.S.L. Property Management, Inc.

Fort Lauderdale, FL 33308
(954)491-4511 (954)491-4504 Fax
**MSL2600@AOL.COM**

TO:      Dani Siegel
              Adrian VanZon
              Glen Parker
              Norman Fosback
              Joan Hoffman
              Paul Marcus
              Deane Marcus

FROM:    Murray and Sheldon Liebowitz

DATE:     August 17th, 2005

RE:        Harbor Inn Apartments

Enclosed please find an analysis comparing the sale of our rental complex at a minimum price of $42,000,000 and a proforma 2006/2007 based upon our continuing to operate the property.

I have been evaluating comparables and believe we can sell the property to a condo converter within the $42,000,000 to $44,000,000 range. I presently have a Letter of Intent to purchase at a price of $43,500,000 with an initial non-refundable deposit of $250,000. The non-refundable deposit is very important as it separates the serious buyer from the "Tire Kicker", who would offer more than they expect to pay but would renegotiate after executing a contract. I will continue to seek higher offers.

The distribution of the cash proceeds from a sale are identical to Courts at Kendall and Harbour Island Club.

If you agree that we should market the property, please sign one Partners Resolution and return in the enclosed Fedex envelope, Both Sheldon and I will vote in favor of a sale. It appears apparent that the market has peaked and it is important that I market this property as soon as possible. I have reached out to those condo converters who bid on the Courts at Kendall but I intend to offer the property to a wider range of condo converters. I cannot sign a Letter of Intent until we receive approval from partners representing a 2/3 interest in the Partnership.

ENC:   Sale Analysis
       Partners Resolution
       Partners Resolution Copy

Hinn/partners resolution sale

## RESOLUTION AND AGREEMENT

THIS AGREEMENT mad this _____ day of August, 2005 by and between the following:

## GENERAL PARTNER

M.S.L. Property Management, Inc....................................................................................1%
2600 E. Commercial Blvd., Suite 200
Ft. Lauderdale, FL 33308


## LIMITED PARTNERS

Dani Siegel ...................................................................................................................19.80%
144 West 86th Street, Apt. 6A
New York, NY 10024

Adrian Van Zon ..............................................................................................................9.90%
25 Rockwood Place, 4th Floor
Englewood, NJ 07631;

**Norman Fosback**...........................................................................................................**4.95%**
**528 Alexander Palm Road**
**Boca Raton, FL 33432**

Glen Parker ......................................................................................................................**4.95%**
2500 East Aya Palm Drive
Boca Raton, FL 33432

Liebowtiz FLP, a Florida Limited Partnership ................................................................**4.95%**
c/o M.S.L. Management, Inc.
2600 E. Commercial Blvd., Suite 200
Ft. Lauderdale, FL 33308;

Sheldon Liebowitz ...........................................................................................................**4.95%**
c/o M.S.L. Management, Inc.
2600 E. Commercial Blvd., Suite 200
Ft. Lauderdale, FL 33308;

Dr. Joan Hoffman...............................................................................................................4.95%

Boca Raton, FL 33432

Deane J. Marcus...............................................................................................................4.95%
4 Hidden Oak Road
Briarcliff Manor, NY 10510

Paul Marcus ...................................................................................................................39.60%
P.O. Box 359
282 Old Dublin Road
Peterborough, NH 03458

TOTAL .........................................................................................................................100.00%
(and sometimes collectively "the Partners").

# WITNESSETH

WHEREAS, the Partners are the General Partner and all of the Limited Partners of Harbor Inn of C.S. Associates, Ltd., a Florida Limited Partnership ("Partnership"); and

WHEREAS, the Partnership is the Owner of the Harbor Inn Apartments, 801 Harbor Inn Drive, Coral Springs, Florida ("the Property"); and

WHEREAS, the Partners are now desirous of agreeing to the sale or other disposition of all or substantially all of the assets of the Partnership in accordance with the terms and conditions of the within Agreement; and

WHEREAS, the Partners are desirous of setting forth certain financial arrangements, and other aspects of the potential sale or disposition of the Property.

NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00), and other good and valuable consideration, in hand paid, each to the other, the receipt and sufficiency of which is hereby acknowledged, the Partners hereby mutually covenant and agree as follows:

1. Section 8 of the Limited Partnership Agreement of Harbor Inn of C.S. Associates Ltd., dated March 31, 1993 ("Partnership Agreement") requires a vote of Partners then owning at least two-thirds (2/3) of the total interest in the Partnership to approve the sale or other disposition of all or substantially all of the assets of the Partnership ("Sale"). Therefore, by executing and affixing their signatures to the within Agreement, the Partners hereby vote and agree to sell the Property ("the Property") for a Minimum Gross Prospective Sale Price ("MGPSP") of $42,000,000.00, less those estimated costs and expenses as set forth on Exhibit "A", attached hereto and made a part hereof.

2. <u>Listing Broker</u>: The Partners agree that the Property shall be listed "exclusively" for sale with Sunvest Real Estate, Inc. ("Sunvest"), a licensed real estate broker of the State of Florida, ("Listing Broker") at a Commission equal to three percent (3%) of the gross sales price. The term of the exclusive listing shall be for a period of six (6) months from the date hereof, and shall commence on the date hereof, and expire six (6) months from the date hereof. Partners agree that the Commission shall be earned upon execution of the Contract of Sale, but will only be due and payable when, as, and if the title is transferred and the purchase price is paid in full. The Commission will be paid at the closing. The Partners hereby acknowledge that the above-referenced commission may not be a competitive commission.

In consideration of the Listing Broker listing and endeavoring to find a buyer for the Property at the MGPSP, the Partners hereby grant the Listing Broker the exclusive right to sell the Property at the MGPSP, and on the terms as stated in this Agreement, or upon such other price, and/or terms as may be acceptable to the Partners (as provided under Section 8 of the Partnership Agreement).

C:\Documents and Settings\Beth\My Documents\0-properties\Harbor Inn\RESOLUTIONANDAGREEMENT.doc

Sunvest agrees that it will pay all expenses for advertising and brochures involved

will not be reimbursed.

The said Sunvest Real Estate, Inc. is an entity solely owned and controlled by Murray Liebowitz and Sheldon Liebowitz, (General Partner and Limited Partners (directly and/or indirectly) in the Partnership).

Sunvest further agrees that it will co-broker the Property with a third party real estate broker and share the real estate commission, if necessary.

Sunvest and the Partners further agree that the Commission may be shared with any broker who assists Sunvest in causing a sale or transfer of the Property as set forth and provided under the within Agreement.

3.      Termination of Management Agreement: Under the terms of that certain Property Management Agreement, dated March 31, 1993, between the Partnership and M.L. Property Management, Inc. (now known as M.S.L. Property Management, Inc.) ("MSL")[1], MSL's obligations under the Management Agreement cease as of the closing of the sale or disposition of the Property.  Further, pursuant to paragraph 2.8 of the Management Agreement, MSL is entitled to be compensated in connection with the sale and/or disposition of the Property.  The amount of such compensation is to be mutually agreed upon.  The Partners hereby agree, ratify and confirm that said fee shall be fixed at one percent (1%) of the gross sales price, plus a sum equal to ten percent (10%) of the net, after tax proceeds and after the payment of the existing mortgage, and all costs of the sale, as all set forth in Exhibit "A", which is attached hereto and made a part hereof.

---

[1] The said M.S.L. Property Management, Inc., is an entity solely owned and controlled by Murray Liebowitz and Sheldon Liebowitz (General Partner and Limited Partners (directly and/or indirectly) in the Partnership).

C:\Documents and Settings\Beth\My Documents\0-properties\Harbor Inn\RESOLUTIONANDAGREEMENT.doc

IN WITNESS WHEREOF, the parties hereto have set their hands and seals, or caused this document to be signed by its proper corporate officer the day and year first above written.


WITNESS:                                          **GENERAL PARTNER:**

                                                  M.S.L. Property Management, Inc.

_____                           By:_____
                                                       Murray Liebowitz, President


WITNESS:                                          **LIMITED PARTNERS:**

                                                  _____
_____                               Dani Siegel

                                                  _____
_____                               **Adrian Van Zon**

                                                  _____
_____                               Glen Parker

                                                  _____
_____                               Norman Fosback

                                                  Liebowitz FLP
                                                  a Florida Limited Partnership

                                                  By:_____
_____                               Murray Liebowitz

                                                  _____
_____                               Sheldon Liebowitz

C:\Documents and Settings\Beth\My Documents\0-properties\Harbor Inn\RESOLUTIONANDAGREEMENT.doc

_____          _____
                                 Dr. Joan Hoffman
                                 Trustee for Joan Osias


_____          _____

                                 Deane J. Marcus


_____          _____

                                 Paul Marcus

C:\Documents and Settings\Beth\My Documents\0-properties\Harbor Inn\RESOLUTIONANDAGREEMENT.doc

## MSL Property Management Inc

(954) 491 4511 (954) 491 4504 (Fax)

August 17, 2005

Harbor Inn Apartments

**Analysis of Sale Vs Income**

Index:
1. Proforma Sale of Property 42,000,000,  43,000,000 and 44,000,000
2. Partners Schedule of Cash Distribution on 42,000,000 sale and 2006 and 2007 Income at new debt service
3. Partners Schedule of Cash Distribution on 43,000,000 sale and 2006 and 2007 Income at new debt service
4. Partners Schedule of Cash Distribution on 44,000,000 sale and 2006 and 2007 Income at current debt service
5. Proforma Income and Expense 2005, 2006 and 2007 new debt service
6. Proposed Refinance
7. Refinance Analysis

F:bin/arch/inn/analysissaleloan

MS[...] 

pperty Management Inc
rma Sale of Property
our Inn Apartments
g November 30, 2005
17-Aug-05

| | $42,000,000 | $43,000,000 | $44,000,000 |
|---|---|---|---|
| [...]ance as of August 31, 2005 | 11,800,000 | 11,800,000 | 11,800,000 |
| [...]pay Penalty Est (1) | 319,769 | 319,769 | 319,769 |
| [...]cess Lender | 500 | 500 | 500 |
| [...]al Commsion 3% | 1,260,000 | 1,290,000 | 1,320,000 |
| [...]al Est | 80,000 | 80,000 | 80,000 |
| [...]ou Fees Est | 10,000 | 10,000 | 10,000 |
| [...]L P[...]ed Distribution 1% | 420,000 | 430,000 | 440,000 |
| [...]on Warranty Deed .007 | 294,000 | 301,000 | 308,000 |
| [...]c St[...]Taxes .00221 | 92,820 | 95,030 | 97,240 |
| [...]e U[...] / Lien Search | 500 | 500 | 500 |
| [...]cord | 500 | 500 | 500 |
| [...]se of Sale | 14,278,089 | 14,327,299 | 14,376,509 |
| [...]ds before Taxes and MSL Dist | 27,721,911 | 28,672,701 | 29,623,491 |
| [...]ated MSL Dist 10% (2) | 2,228,947 | 2,309,764 | 2,390,582 |
| [...]trib to Partners | 25,492,964 | 26,362,937 | 27,232,909 |
| [...]ated Taxes (3) | 5,432,439 | 5,575,058 | 5,717,676 |
| [...]t Estimated Taxes | 20,060,525 | 20,787,879 | 21,515,233 |
| | =========== | =========== | =========== |

[...]n a Calculation prepared by Arbor 8/12/05 for 11/30/05 closing
MS[...]% Dist is based on Net Proceeds from Sale less Est Taxes
E[...]ted Taxes prepared by Weinberg & Co on 8/11/2005

[...]orinna7310S123.1231

**TY MANAGEMENT INC**
...nn Apartments
...rs Schedule of
Distribution
7-Aug-05

...rice $42,000,000

...e Taxes and Bonus 27,721,911
2,226,947

Distri... $25,492,964

| | % | Pre Tax Distribution | Est Tax $5,432,439 | Net After tax | 2006 Dist From Income | 2007 Dist From Income |
|---|---|---|---|---|---|---|
| ution to Partners | | | | | | |
| ERS | | | | | | |
| RAL... | | | | | | |
| ...gement Inc | 1.00% | $254,930 | $54,324 | $200,605 | $12,018 | $13,576 |
| ED P... | | | | | | |
| RS | | | | | | |
| Aero... | 38.60% | 10,095,214 | 2,151,246 | 7,943,968 | 475,903 | 537,600 |
| Siege | 19.80% | 5,047,607 | 1,075,623 | 3,971,984 | 237,951 | 268,800 |
| ...Var | 9.90% | 2,523,803 | 537,811 | 1,985,992 | 118,976 | 134,400 |
| an F... | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| Park | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| ...itz | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| on L... | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| an H | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| Trustee for Joan Osias | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| Mard | 4.95% | 1,261,902 | 268,906 | 992,996 | 59,488 | 67,200 |
| **TOTAL** | 100.00% | $25,492,964 | $5,432,439 | $20,060,525 | $1,201,774 | $1,357,575 |
| | | | 0 | 0 | 0 | 0 |

...ciati...

...mot | (417,626) | (406,014)

...mot and Roof Expense | (417,626) | (406,014)

**Taxable** | $784,148 | $951,561

3 of 7

...TY MANAGEMENT INC
...nn Apartments
...s Schedule of
...Distribution
-Aug-05

$43,000,000

28,672,701
2,309,764

$26,362,937

| | % | Pre Tax Distribution | Est Tax $5,575,058 | Net After tax | 2006 Dist From Income | 2007 Dist From Income |
|---|---|---|---|---|---|---|
| ...ment Inc | 1.00% | $263,629 | $55,751 | $207,879 | $12,018 | $13,576 |
| ...arca... | 39.60% | 10,439,723 | 2,207,723 | 8,232,000 | 475,903 | 537,600 |
| ...iegel | 19.80% | 5,219,862 | 1,103,861 | 4,116,000 | 237,951 | 268,800 |
| ...Van | 9.90% | 2,609,931 | 551,931 | 2,058,000 | 118,976 | 134,400 |
| ...n Fo... | 4.95% | 1,304,965 | 275,965 | 1,029,000 | 59,488 | 67,200 |
| ...arke... | 4.95% | 1,304,965 | 275,965 | 1,029,000 | 59,488 | 67,200 |
| ...tz F... | 4.95% | 1,304,965 | 275,965 | 1,029,000 | 59,488 | 67,200 |
| ...n Lic... | 4.95% | 1,304,965 | 275,965 | 1,029,000 | 59,488 | 67,200 |
| ...on Ho... | 4.95% | 1,304,965 | 275,965 | 1,029,000 | 59,488 | 67,200 |
| ...ustee for Joan Oalas | 4.95% | 1,304,965 | 275,965 | 1,029,000 | 59,488 | 67,200 |
| | | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 100.00% | $26,362,937 | $5,575,058 | $20,787,879 | $1,201,774 | $1,357,575 |

| Taxable | | |
|---|---|---|
| | (417,626) | (406,014) |
| ...ort and Roof Expense | (417,626) | (406,014) |
| | $784,148 | $951,551 |

23

prof...

**L PROPERTY MANAGEMENT INC**
Harbor Inn Apartments
Partners Schedule of
Cash Distribution
17/Aug-05

4 of 7

$44,000,000

ceeds before Taxes and Bonus    29,623,491
SL Distribution    2,390,582

istribution    $27,232,909

| | % | Pre Tax Distribution | Est Tax $5,711,876 | Net After tax | 2006 Dist From Income | 2007 Dist From Income |
|---|---|---|---|---|---|---|
| inco | | | | | | |
| **RAL PARTNERS** | | | | | | |
| Distribution to Partners | | | | | | |
| roperty Management Inc | 1.00% | $272,329 | $57,177 | $215,152 | $12,016 | $13,576 |
| **ED PARTNERS** | | | | | | |
| lances | 39.60% | 10,784,722 | 2,264,200 | 8,530,522 | 475,903 | 537,600 |
| Siegel | 19.60% | 5,392,116 | 1,132,100 | 4,260,016 | 237,951 | 268,800 |
| Van Zon | 9.90% | 2,695,605 | 566,050 | 2,130,055 | 118,976 | 134,400 |
| on Foolock | 4.95% | 1,348,020 | 283,025 | 1,065,004 | 59,488 | 67,200 |
| Parker | 4.95% | 1,348,020 | 283,025 | 1,065,004 | 59,488 | 67,200 |
| wz FLP | 4.95% | 1,348,020 | 283,025 | 1,065,004 | 59,488 | 67,200 |
| on Liebowitz | 4.95% | 1,348,020 | 283,025 | 1,065,004 | 59,488 | 67,200 |
| an Hoffman Trustee for Joen Oates | 4.95% | 1,348,020 | 283,025 | 1,065,004 | 59,488 | 67,200 |
| Marcus | 4.95% | 1,348,020 | 283,025 | 1,065,004 | 59,488 | 67,200 |
| | | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 100.00% | $27,232,000 | $5,717,876 | $21,915,203 | $1,201,774 | $1,357,575 |

ciation and Amort      (417,626)    (406,014)

tal Dep & Amort and Roof Expense

Taxable    (417,626)    (406,014)
   $784,148    $951,561

sproformiln 123

HARBOR INN APARTMENTS
PROPOSED DEBT SERVICE
PROFORMA  INCOME & EXPENSE
FOR THE YEAR 2005 & 2006 & 2007
Revised August  15, 2005

| NUMBER OF UNITS    310 | 2005 Budget | June  05 RENTS Annualized | Market Rent Roll 2005 | Market Rent Roll 2006 | Market Rent Roll 2007 |
|---|---|---|---|---|---|
| CURRENT RENT ROLL | 3,238,152 | 3,298,272 (4) | 3,502,545 (1) | 3,670,545 (2) | 3,875,745 (2) |
| VACANCY | (161,908) (3) | (103,951) (4) | (105,076) (5) | (110,115) (5) | (116,272) (5) |
| SERVICE APARTMENTS | (22,176) | (22,176) (4) | (29,340) | (29,340) | (29,340) |
| RENT UP ALLOWANCE | (16,191) (3) | (1,200) (4) | (8,756) (5) | (9,175) (5) | (9,689) (5) |
| ADDITIONAL INCOME | 108,000 | 90,815 (4) | 108,000 | 108,000 | 108,000 |
| POTENTIAL GROSS INCOME | 3,145,878 | 3,261,760 | 3,467,375 | 3,629,915 | 3,826,446 |
| EMPLOYEE LEASING | 250,900 | 250,900 | 250,900 | 258,427 (7) | 266,180 (7) |
| ELECTRIC | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| WATER & SEWER | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 |
| GAS | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| SANITATION | 79,926 | 79,926 | 79,926 | 79,926 | 79,926 |
| TELEPHONE | 11,400 | 11,400 | 11,400 | 11,400 | 11,400 |
| MANAGEMENT FEE 5% | 157,294 | 163,088 | 173,369 | 181,496 | 191,422 |
| ADVERTISING | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 |
| OFFICE EXPENSE | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| BOOKEEPING FEES | 11,160 | 11,160 | 11,160 | 11,160 | 11,160 |
| PROPERTY INSURANCE | 138,942 | 154,913 (4) | 177,263 (6) | 182,581 (7) | 188,058 (7) |
| LICENSES & FEES | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| REAL ESTATE & PERSONAL PROP. TAX | 416,533 | 416,533 | 416,533 | 429,029 (7) | 441,900 (7) |
| REPAIRS & MAINTENANCE | 108,500 | 108,500 | 108,500 | 111,755 (7) | 115,108 (7) |
| REPLACEMENTS | 85,250 | 85,250 | 85,250 | 87,808 (7) | 90,442 (7) |
| MISCELLANEOUS | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| LANDSCAPE MAINTENANCE | 38,400 | 38,400 | 38,400 | 38,400 | 38,400 |
| EMPLOYEE INSURANCE | 23,126 | 23,126 | 23,126 | 23,820 (7) | 24,535 (7) |
| TOTAL EXPENSES | 1,496,931 | 1,518,596 | 1,551,326 | 1,591,301 | 1,634,031 |
| NET OPERATING INCOME | 1,648,947 | 1,743,064 | 1,916,049 | 2,038,614 | 2,194,415 |
| EXTRAORDINARY EXPENSE & CAPITAL (Schedule A) | 131,000 | 131,000 | 131,000 | 131,000 | 131,000 |
| CASH FLOW BEFORE DEBT SERVICE | 1,517,947 | 1,612,064 | 1,785,049 | 1,907,614 | 2,063,415 |
| DEBT SERVICE 13,600,000 @ 5.19% Interest Only | 705,840 (8) | 705,840 (8) | 705,840 (8) | 705,840 (8) | 705,840 (8) |
| NET OPERATING CASH FLOW | 812,107 | 906,224 | 1,079,209 | 1,201,774 | 1,357,575 |
| DEPRECIATION & AMORT | 432,819 | 432,819 | 432,819 | 417,626 | 406,014 |
| LIST | | | | | |
| LIST | | | | | |
| TOTAL DEP & AMORT | 432,819 | 432,819 | 432,819 | 417,626 | 406,014 |
| NET TAXABLE ( LOSS) | 379,288 | 473,405 | 646,390 | 784,148 | 951,561 |

(1) RENTS BEING CHARGED TO NEW AND RENEWAL TENANTS
    WILL TAKE ONE YEAR TO REACH FIGURE
(2) RENT INCREASE OF $40.00 PER UNIT ON ALL 1/1 AND $50.00 PER UNIT ON 2/2  FOR 2006
(2) RENT INCREASE OF $50.00 PER UNIT ON ALL 1/1 AND $60.00 PER UNIT ON 2/2 FOR 2007
(3) VACANCY BASED ON 5% AND RENT UP ALLOWANCE .50%
(4) JUNE, 2005 ANNUALIZED
(5) VACANCY BASED ON 3% AND RENT UP ALLOWANCE  AT 25%
(6) BASED ON NEW INSURANCE POLICY 4/12/05
(7) EXPENSES INCREASED BY 3% IN 2006 AND 2007
(8) NEW DEBT SERVICE

REFINANCE -CLOSING 11/30/05

| | |
|---|---|
| NEW MORTGAGE AMOUNT | $13,600,000 |
| MORTGAGE PAY OFF 11/30/05 | 11,800,000 |
| EST CLOSING COSTS | 550,273 |
| NET PROCEEDS  (5) | 1,249,727 |
| | ============= |

| | | LOAN |
|---|---|---|
| | CLOSING COSTS | 13,600,000 |
| | EST TITLE INSURANCE | 36,476 |
| | EST SURVEY | 4,500 |
| | EST LEGAL FEES- Partnership | 15,000 |
| | MORTGAGE PLACEMENT FEE 1% MSL | 136,000 |
| | MORTGAGE PLACEMENT FEE .00% LENDER | 0 |
| (4) | EST DOC STAMPS .0035% | 6,300 |
| (1) | EST APPLICATION | 25,000 |
| | EST RECORDING FEE | 250 |
| | EST TERMITE INSPECTION | 1,500 |
| (4) | EST INT TAX.00221% | 3,978 |
| (2) | EST PREPAYMENT PENALTY | 319,769 |
| | EST MISC. | 1,500 |
| | TOTAL EST CLOSING COSTS | $550,273 |
| | | ============= |

| | | |
|---|---|---|
| | LOAN TERM 10 YEARS INTEREST ONLY | |
| (3) | RATE 92 BASES PTS Over 10 Year T Bill 4.27% | 5.19% |
| | ANNUAL DEBT SERVICE | $705,840 |
| | CURRENT ANNUAL DEBT SERVICE INTEREST | 8.285% |
| | CURRENT ANNUAL DEBT SERVICE ON  $11,800,000 | 977,630 |

(1) PAID TO MTG CO. FOR APPRAISAL, ENGINEER STUDY AND LEGAL

(2) BASED ON A CALCULATION PREPARED BY ARBOR 8/12/05 AND
    CLOSING DATE OF 11/30/05

(3) AS OF 8/15/05
(4) BASED ON ASSUMING AND AMENDED EXISTING NOTE
(5) NET PROCEEDS TO BE USED FOR ROOF REPLACEMENT

2005 HARBOR INN APT REFINANCE proposal.WK3

Refinance Analysis @ 5.19%
Harbor Inn Apartments

**Current Mortgage**                                        11,800,000
Loan Start Jan 25, 2000
Maturity 2/1/2007
Prepayment 2/1/00 to 7/31/06 Yield Maintenance
Prepayment 8/1/06 to 10/31/06 1% of balance
No Prepayment Penalty 11/1/06 to 2/1/2007

**Proposed Mortgage**
New Mortgage (Costs plus 1,200,000 roof replace)           13,600,000

Interest Rate 92 base pts over 10 yr TBill 4.27% (1)            5.19%
Debt Service at 5.19%                                         705,840

Current annual debt service payment 8.285%                                    $977,630
New annual debt service payment                                                705,840
                                                                          -----------------
            Annual debt service savings                                       $271,790
                                                                          ==============

Increase cash from closing                                                   1,240,582
Increase in cash flow over 10 years                                          2,717,900
                                                                          -----------------
            Total increase in cash                                          **3,958,482**
**Less Increase in debt**                                                   **1,800,000**
**Less Roof Replacement**                                                   **1,200,000**
                                                                          -----------------
            Net Cash                                                          958,482
                                                                          ==============

Loan costs (2)                                               230,504
Prepayment Penalty (3)                                       319,769
                                                         ----------------
            Total loan costs                                $550,273
                                                         ==============

Appraised Value 12/21/99                                    $18,100,000

(1) AS OF 8/15/05

(2) Tax Deductible over life of Mtg

(3) Tax Deductible in current year
(3) Based on a calculation prepared by Arbor 8/12/05
        for 11/30/05 closing

2005innrefinanalysis.123

# EXHIBIT
# 4

Saddle River, New Jersey 07458

September 7, 2005

*VIA FACSIMILE*
*Via Certified Mail*
*Return Receipt Requested*
Mr. Murray Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida  33308

Re:     **Response to Notice of Contemplated Sale**

Dear Mr. Liebowitz:

I have reviewed the documentation you sent me regarding a proposed sale of Harbor Inn, received on August 23, 2005.  This letter constitutes my written response as required by section 8 of the Partnership Agreement.  Although I remain entirely committed to the immediate sale of the property, I cannot approve a sale on the terms you have set forth.  Although I called you to attempt to work this out last week, you hung up on me before we could discuss the matter.  As a result, I take this opportunity to explain my position in the hopes that we can resolve the situation efficiently and to the benefit of all the limited partners.

The fundamental problem with the terms of your Notice of Contemplated Sale is that the Minimum Gross Prospective Sale Price for which you seek approval is too low, for two reasons: (1) the fees to your affiliated companies are too high; and (2) the minimum sale price of $42 million, on which the Minimum Gross Prospective Sale Price is based, is too low.  Please consider the following.

The fees you are seeking to pay your own affiliated companies in connection with the sale, totaling nearly $4 million, are not supportable by the partnership or management agreements, and are grossly unfair to the limited partners.  First, you have included in your prospective sale proposal a 3% brokerage commission to Sunvest Real Estate, Inc. (as "exclusive" broker), an affiliate of MSL.  Under prevailing industry standards, of which you are aware, the brokerage commission on this size property usually does not exceed 0.85-1%.[1] Further, there are viable buyers for Harbor Inn willing to pay **all brokerage commissions**.  A 3% commission for an exclusive listing is thus patently unreasonable.

---

[1] The Resolution and Agreement that you provided the partners acknowledges that the 3% commission "may not be a competitive commission."

1

Saddle River, New Jersey 07458

Based on a sale price of $42 million, this 3% fee reduces the return to the limited partners as follows:

| Limited Partner | Without the 3% commission each partner receives an **additional**: | Allowing a standard 1% commission each partner receives an **additional**: |
|---|---|---|
| Paul Marcus | $ 498,960 | $ 332,640 |
| Dani Seigel | $ 249,480 | $ 166,320 |
| Adrian Van Zon | $ 124,740 | $  83,160 |
| Norman Fosback | $  62,370 | $  41,580 |
| Glen Parker | $  62,370 | $  41,580 |
| Liebowitz FLP | $  62,370 | $  41,580 |
| Sheldon Liebowitz | $  62,370 | $  41,580 |
| Dr. Joan Hoffman | $  62,370 | $  41,580 |
| Deane Marcus | $  62,370 | $  41,580 |

It is unfair for you to require the limited partners to pay you a real estate commission of over $1.2 million when there are buyers willing to bear a reasonable commission, at no cost to the partnership.

Second, included in your prospective sale proposal is a "management" fee to MSL of 1% on the gross selling price and 10% on the net proceeds. The Resolution and Agreement sent to the limited partners implies that the Property Management Agreement establishes that a fee is to be paid to MSL as property manager upon termination of the Management Agreement as a fee for assisting in the sale. The Property Management Agreement does not provide for **any** such fees. Specifically, the whole of section 2.8 of the Harbor Inn Management Agreement, titled "Refinancing, Sale or Disposition of Property," a copy of which is enclosed, provides that

The Management Company shall cooperate with, and advise and assist, the Owner in any desired refinancing, sale or other disposition of the Property. In that regard, the Management Company shall be responsible for supervising the preparation of all financial, lease, and operational information, data and reports desired or required with respect thereto, and shall advise and consult with any prospective lenders or buyer designated by Owner concerning all operational and management functions and requirements of the Property. Management will be compensated for this additional **expense**.

Even the Park Plaza Property Management Agreement, which has no application here, but from which MSL has purported to draw its authority to charge the partnerships a 1% fee for a re-finance, states only that "In the event of a refinance, the parties agree that the Management Company's fee shall be equal to one (1%) of the new mortgage." Neither partnerships' Management Agreement provides for or allows the type of exorbitant fees MSL is seeking to

2

Saddle River, New Jersey  07458

impose here.  Thus, although MSL would be entitled to reimbursement for its **expenses** in assisting with a sale, there is neither a provision for a 1% fee on the gross nor a 10% fee on the net  in the event of a sale.

Based on a sale price of $42 million, the 1% "management" fee would reduce the actual return to the limited partners as follows:

| Partner | Without the 1% "management" fee each partner receives an *additional*: |
|---|---|
| Paul Marcus | $ 166,320 |
| Dani Seigel | $  83,160 |
| Adrian Van Zon | $  41,580 |
| Norman Fosback | $  20,790 |
| Glen Parker | $  20,790 |
| Liebowitz FLP | $  20,790 |
| Sheldon Liebowitz | $  20,790 |
| Dr. Joan Hoffman | $  20,790 |
| Deane Marcus | $  20,790 |

**Based on a sale price of $42 million and your estimate of the taxes due on sale gain, the 10% "management" fee on the net sale price would reduce the actual return to the limited partners as follows:**

| Partner | Without the 10% fee each partner receives an *additional*: |
|---|---|
| Paul Marcus | $ 882,663 |
| Dani Seigel | $ 441,332 |
| Adrian Van Zon | $ 220,666 |
| Norman Fosback | $ 110,333 |
| Glen Parker | $ 110,333 |
| Liebowitz FLP | $ 110,333 |
| Sheldon Liebowitz | $ 110,333 |
| Dr. Joan Hoffman | $ 110,333 |
| Deane Marcus | $ 110,333 |

total fees you are attempting to force upon the limited partnership seriously impacts upon each individual partner's return as follows:

| Partner | Amount to be received under the sale as proposed | Amount to be received without MSL's exorbitant fees |
|---|---|---|
| Paul Marcus | $ 10,095,214 | $ 11,643,157 |
| Daniel Seigel | $ 5,047,607 | $ 5,821,579 |
| Adrian Van Zon | $ 2,523,803 | $ 2,910,789 |
| Norman Fosback | $ 1,261,902 | $ 1,455,395 |
| Glen Parker | $ 1,261,902 | $ 1,455,395 |
| Liebowitz FLP | $ 1,261,902 | $ 1,455,395 |
| Sheldon Liebowitz | $ 1,261,902 | $ 1,455,395 |
| Dr. Joan Hoffman | $ 1,261,902 | $ 1,455,395 |
| Deane Marcus | $ 1,261,902 | $ 1,455,395 |
| MSL – General Partner | $ 254,930 | $ 294,019 |
| **TOTAL TO LIMITED PARTNERS** | **$ 25,492,964** | **$ 29,401,914** |

Imposing these fees upon the limited partners without contractual support or factual basis is a clear breach of fiduciary duty. The fees would be even more excessive should you achieve a greater selling price. While you have gotten the approvals of the other limited partners to pay yourself these fees, it is not clear that you have provided them with all the necessary information upon which they could have made an informed decision. Combined, the additional sale fees you seek to force upon the limited partners amounts to a total fee of $3.9 million to MSL or its affiliates (based on a sale price of $42,000,000), above and beyond the 1% general partner ownership interest. The difference in return to the limited partners is substantial even if the sale price were only $42 million. To sum up, you are attempting to force the limited partners to pay to the General Partner and its affiliates nearly $4 million in unsupportable fees, and each limited partner would have to bear his or her pro rata share. I cannot agree to pay 40% (or 45% including Deane Marcus' interest) of these fees.

4

Paul Marcus

Third, per your proposal, Harbor Inn would be sold for a minimum of $42 million or a Minimum Gross Prospective Sale Price of approximately $37 million (that is, net proceeds to the partners after expenses and before the mortgage). Your minimum selling price is low considering both the market and the higher offer you have received of $43.5 million. Although it is my hope that you would try and achieve the highest selling price possible, given that you have already received a credible offer of $43.5 million and your stated belief that you could get an even higher price, I would be agreeable to a minimum selling price of $43.5 million with the expectation that you would endeavor to achieve the highest possible price and follow the terms of the Property Management Agreement.

Again, I am committed to effectuating a sale of Harbor Inn as soon as possible. It is my hope that we can quickly come to an agreement that will be mutually beneficial to all the partners and maximize our returns. I would be willing to vote in favor of a sale with a minimum prospective sale price of $43.5 million and a 1% total fee to MSL or its affiliates. I must vote no due to the present terms of the proposed sale. You can reach me at either (603) 924-5918 or (201) 818-5035.

Sincerely,

Paul Marcus

cc:    Lawrence Bathgate, Esq.
       Elliot Weinberg, CPA

shall be the property of the Owner; provided, however, that the

records and other information and to make copies thereof during

the three (3) year period referred to in the preceding sentence.

(b)   **Monthly Report.**   Within thirty (30) days

after the end of each month, the Management Company shall deliver

to the Owner a statement of cash flow showing the results of

operations for that month prepared in accordance with the Owner's

accounting methods.   Management will be compensated for this

additional expense.

(c)   **Returns Required by Law.**   The Management

Company shall execute and file punctually when due, on behalf of

itself and/or the Owner, all forms, reports and returns required

by law with respect to the Ownership of the Property, including

**those forms, reports and returns relating to the employment of**

**personnel.**

2.8   **Refinancing, Sale or Disposition of Property.**   The

Management Company shall cooperate with, and advise and assist,

the Owner in any desired refinancing, sale or other disposition

of the Property.   In that regard, the Management Company shall be

responsible for supervising the preparation of all financial,

lease, and operational information, data and reports desired or

required with respect thereto, and shall advise and consult with

any prospective lenders or buyer designated by Owner concerning

all operational and management functions and requirements of the

expense.

## ARTICLE 3

### Relationship of Management Company to Owner

3.1    Compensation of Management Company.    For the
period commencing on the date of this Agreement and so long as
the Management Company is acting as manager of the Property
pursuant to this Agreement, the Management Company shall receive
for its services performed under this Agreement an initial set up
fee of five thousand dollars ($5,000.00) plus compensation equal
to five percent (5%) of the gross receipts from the ownership and
operation of the Property actually received by the Owner (the
"Management Fee"), such compensation to be paid monthly in
arrears.    The term "gross receipts" shall not include tenant
security deposits (until taken as liquidated damages), prepaid
rent (until such rent has accrued), sales tax paid by tenants
(except to the extent of the Owner's allowance, if any, for
collecting such taxes), utility expenses paid by tenants, cable
television chages paid by tenants (except to the extent of the
Owner's portion, if any of such charges), insurance proceeds and
returned premiums, condemnation proceeds or payments in lieu
thereof, or tax refunds.    The Management Company shall, from the
funds collected and deposited, cause to be disbursed regularly
and punctually.

Deane J. Marcus

September 7, 2005

*VIA FACSIMILE*
*Via Certified Mail*
*Return Receipt Requested*
Mr. Murray Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida  33308

Re:   Harbor Inn, Response to Notice of Contemplated Sale

Dear Mr. Liebowitz:

I have reviewed the documentation you sent to the limited partners regarding a proposed sale of Harbor Inn.  For the reasons set forth in Paul Marcus' letter to you, dated September 7, 2005, I must also refuse to agree to the sale on the terms proposed.  I would agree to a sale on the terms stated in Paul Marcus' letter.

Very truly yours,

Deane Marcus

cc:   Lawrence Bathgate, Esq.
      Elliot Weinberg, CPA

# EXHIBIT
# 5

200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

William K. Hill, P.A.

September 12, 2005

*Via Facsimile*

Mr. Murray Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida 33308

Re: **Sale of Harbor Inn Apartments**

Dear Mr. Liebowitz:

On or about September 7, 2005 you should have received Paul and Deane Marcus' sale refusal letters. Pursuant to section 8 of the Harbor Inn Limited Partnership Agreement, you are now required to send a "Sale Notice." Upon receipt of the Sale Notice, Paul and Deane Marcus will have 10 business days within which to change their votes. If Paul and Deane Marcus do not receive a Sale Notice by the close of business on Wednesday, September 14, 2005, we will consider your prior Sale Notice, prematurely sent, as a Sale Notice effective September 14, 2005. Paul and Deane Marcus will be required to respond the Sale Notice on or before Wednesday, September 28, 2005.

If you have any question, please do not hesitate to contact me.

Very truly yours,

William K. Hill, P.A.

WKH:jhs

cc:  Paul Marcus
      Peter Goldman
      Larry Bathgate



MIAMI 926920.1 7613522017

Harbor Inn of CS Associated, Ltd.
d/b/a Harbor Inn Apartments

## SALE NOTICE

TO:      LIMITED PARTNERS:
                Dani Siegel
                Adrian Van Zon
                Glen Parker
                Norman Fosback
                Liebowitz FLP
                Sheldon Liebowitz
                Dr. Joan Hoffman Trustee for Joan Osias
                Paul Marcus
                Deane J. Marcus

FROM:    GENERAL PARTNER:
                M.S.L. Property Management, Inc.

DATED:    August 30, 2005

This Sale Notice shall be deemed to be that "Sale Notice" referenced in Section 8 of that certain Amended and Restated Certificate of Agreement of Limited Partnership of Harbor Inn of CS Associates, Ltd., a Florida Limited Partnership, dated March 1993.

Each Limited Partner has heretofore, on or about August 17, 2005, been provided with a Resolution and Agreement (Notice of Contemplated Sale ("NCS:")), the terms and conditions of which are hereby incorporated by reference as though fully set forth herein.

The results of the vote are that each Limited Partner (with the exception of Paul Marcus and Deane J. Marcus) responded in writing, and voted in favor of the sale as set forth in the NCS above referenced.

While neither Paul Marcus (39.60%) nor Deane J. Marcus (4.95%) have responded in writing, they each may be deemed a Sale Refusal Partner as set forth in Section 8 of the Limited Partnership Agreement above referenced. Therefore, each Sale Refusal Partner shall have ten (10) business days from the receipt of the within Sale Notice within which to provide the General Partner with written notice of a change in vote in favor of the sale.

Lack of a receipt by the General Partner of any written response from a Sale Refusal Partner shall be deemed a Change in Vote, and such Sale Refusal Partner shall thereby be deemed to have approved the sale and become a Selling Partner.

1

Inasmuch as Limited Partners owning 54.55% of the Limited Partnership have voted in favor of the sale referenced in the NCS, which represents one-half (1/2) or more, but less than two-thirds (2/3) of the total partnership interest, the provisions of Section 8 are now legally operative. If the Sale Refusal Partners (Paul Marcus and Deane J. Marcus) remain opposed to the sale, then and in that event, each such Sale Refusal Partner shall be required to purchase and acquire the partnership interest of the Selling Partners, and to perform in accordance with the procedures set forth in the Limited Partnership Agreement and the NCS.

Failure by the Sale Refusal Partners to respond in writing within ten (10) business days from receipt of this Notice shall be deemed an approval of sale by the said Limited Partner(s).

IN WITNESS WHEREOF, we have here unto affixed our hands and seals this 30th day of August, 2005.

GENERAL PARTNER
M.S.L. Property Management, Inc.

By: _____
        Murray Liebowitz, President

cc:     Lawrence E. Bathgate, II
        Elliott Weinberg, CPA

Enclosure: Section 8 of the Limited Partnership Agreement

2

200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340
TELEPHONE: (305) 374-7580 • FAX: (305) 374-7593         William K. Hill, P.A.

MIAMI • TALLAHASSEE

September 6, 2005

**_Via Facsimile and Certified Mail_**

Mr. Murray Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida 33308

Re: **Harbor Inn Apartments**

Dear Mr. Liebowitz:

Paul Marcus received your document denominated "Sale Notice" dated August 30, 2005. Please be advised that Paul Marcus has not yet responded to your prior Notice of Contemplated Sale, as his response is not due until September 7, 2005, or 10 business days after receipt of the Notice by Paul Marcus on August 23, 2005. (Please see the copy of my letter to you dated August 24, 2005, confirming receipt by Paul Marcus on August 23, 2005.) Your "Sale Notice" is therefore premature.

If you have any question, please do not hesitate to contact me.

Very truly yours,

William K. Hill, P.A.

WKH:jhs

cc: Paul Marcus
    Peter Goldman
    Enclosure



FACSIMILE: 954 713 0976
www.broadandcassel.com

**BROAD** and **CASSEL**

August 29, 2004

VIA FACSIMILE AND U.S. MAIL

William King Hill
Bilzin Sumberg Baena Price & Axelrod LLP
Wachovia Financial Center, #2500
200 S. Biscayne Boulevard
Miami, FL  33131-2362

RE:    Marcus v. MSL
         Our File:  34885-0002

Dear Mr. Hill:

By letter memorandum dated August 17, 2005, Murray Liebowitz notified the limited partners of Harbor Inn of his desire to market that property for sale to "condo converters." Included in Mr. Liebowitz' letter memorandum was a "Partners Resolution" for each limited partner. I am now advised that the voting limited partners (representing 54.45% of the limited partners), have signed and returned the Partners Resolution. I am further advised that Mr. Paul Marcus spoke to Mr. Liebowitz and advised that he would not be signing the Partners Resolution.

Please consider this letter written notice under Section 8.2(a) of the Harbor Inn Limited Partnership Agreement giving Mr. Marcus 10 business days to change his mind. In the event Mr. Marcus changes his mind in this 10 day period, Harbor Inn will be immediately marketed for sale as discussed in Mr. Liebowitz' August 17, 2005, letter memorandum. In the event Mr. Marcus does not sign and return the Partners Resolution within the 10 day time frame, Mr. Marcus will then be obligated to purchase the other limited partnership's interest in accordance with Section 8 of the Limited Partnership Agreement. As you know, time is of the essence and we would ask that, notwithstanding the 10 day time frame provided for in the Harbor Inn Limited Partnership Agreement, Mr. Marcus make his intentions known immediately.

Very truly yours,

BROAD AND CASSEL

Peter R. Goldman

PRG/sb

cc:    All Limited Partners (via MSL)
       Elliott Weinstein
       Larry Bathgate, Esq.

FTL1\COMMLIT\182367.1
34885/0002 PRG sb 8/29/2005 4:37 PM

**EXHIBIT
6**

Paul Marcus

Saddle River, New Jersey 07458-3000

September 28, 2005

***Via Facsimile and Certified Mail***

Mr. Murray Liebowitz
Mr. Sheldon Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida  33308

      Re:  **Sale of Harbor Inn Apartments**

Gentlemen:

      In response to the Sale Notice for Harbor Inn, received as of September 14, 2005, please consider this my notice that I remain opposed to the sale of Harbor Inn on the terms set forth in your Notice of Contemplated Sale received on August 23, 2005, for the reasons set forth in my letter to you dated September 7, 2005.

      Sincerely,

      Paul Marcus



# EXHIBIT
# 7

200 SOUTH BISCAYNE BOULEVARD, SUITE 2500 • MIAMI, FLORIDA 33131-5340

MIAMI • TALLAHASSEE

William K. Hill, P.A.
Direct: 305-350-7202
Fax: 305-351-2216

September 14, 2005

**_Via Facsimile and Certified Mail_**

Mr. Murray Liebowitz
Mr. Sheldon Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida  33308

Re:  **Sale of Harbor Inn Apartments**

Gentlemen:

As you know, I represent Paul Marcus, the limited partner owning approximately 40 % of the partnership shares of Harbor Inn of CS Associates, Ltd. ("Harbor Inn").  In connection with the Notice of Contemplated Sale ("NCS") received by Paul Marcus on or about August 23, 2005, please provide as soon as possible but at any rate no later than this Friday, September 16, 2005, copies of the following documents for the Harbor Inn apartments:

1.  Current Rent Roll
2.  Concessions Detail
3.  Real Estate and Personal Property Tax Bills for 2003 and 2004
4.  Contracts for service to provide the following:

   a.  Landscaping
   b.  A/C maintenance
   c.  Security
   d.  Trash removal
   e.  Turnover
   f.  Cleaning
   g.  Cable television
   h.  Laundry

5.  Most recent water and sewer bills
6.  Equipment leases
7.  Most recent property survey
8.  Most recent property condition/engineering report
9.  Termite insurance policy or bond



Mr. Murray Liebowitz
September 14, 2005
Page two


     10. Details of any restrictive covenants, deed restrictions, income restrictions or
similar covenants that may affect the use of the property
     11. Copies of the Resolution and Agreement (Notice of Contemplated Sale)
signed by the limited partners of Harbor Inn (other than Paul and Deane Marcus), as
referenced in MSL's memo to limited partners dated August 30, 2005

     If you have any questions concerning any of these documents, please do not
hesitate to call me.  If MSL or Harbor Inn does not have any of the documents requested,
please so inform me.

     We may need further documents.  If so, I will notify you promptly.

     I will pay promptly all costs of copies, or if you prefer, will send an outside
copying service to make the copies.  It is important that I be provided the copies by the
time indicated.  If there is any delay expected with obtaining any of the copies, please
provide all the other documents promptly, and we can discuss how best to obtain the
remaining documents.


                                        Very truly yours,



                                        William K. Hill, P.A.


cc      Peter Goldman
        Larry Bathgate
        Paul Marcus


**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com.

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

*Sent To* Liebowitz - MSL Properties
*Street, Apt. No.; or PO Box No.*
*City, State, ZIP+4*

200 SOUTH BISCAYNE BOULEVARD, SUITE 2600 • MIAMI, FLORIDA 33131-5340
TELEPHONE: (305) 374-7580 • FAX: (305) 374-7593

MIAMI • TALLAHASSEE                                    Fax: 305-351-2216

September 16, 2005

***Via Facsimile and Certified Mail***

Mr. Murray Liebowitz
Mr. Sheldon Liebowitz
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida  33308

      Re:  <u>**Sale of Harbor Inn Apartments**</u>

Gentlemen:

      By letter dated September 14, 2005, I requested, on behalf of Paul Marcus, copies of certain partnership documents, to be provided by close of business today.  Please advise when the documents will be ready, as I will send a courier for them.

      Very truly yours,

      William K. Hill, P.A.

cc    Peter Goldman
      Lawrence Bathgate
      Paul Marcus

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  Murray & Sheldon Liebowitz
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

7005 1160 0005 0154 2711

PS Form 3800, June 2002                    See Reverse for Instructions

Paul Marcus

October 13, 2005

*VIA FACSIMILE*
Mr. Richard Paese, Manager
M.S.L. Property Management, Inc.
2600 E. Commercial Boulevard #200
Fort Lauderdale, Florida 33308
FAX #(954) 491-4504
        Re: <u>**Harbor Inn Apartments**</u>

Dear Mr. Paese:

        Can you please provide me a copy of the most current rent roll for Park Plaza?
Please advise when it will be available and I will have a messenger come to your office to
pick it up. Thank you.

                                        Very truly yours,

                                        Paul Marcus

Saddle River, New Jersey 07458-2610

Murray and Sheldon Liebowitz
MSL Property Management, Inc.
2600 East Commercial Boulevard, #200
Fort Lauderdale, Florida 33308

Re: Harbor Inn                                              October 28, 2005

Dear Murray and Sheldon:

On several occasions I have requested information to which I am entitled as a limited partner of
Harbor Inn. William Hill, my attorney, requested a current rent roll and other specific information
in his letter of September 26, 2005 to Lawrence Bathgate, which was passed on to you. My letter
of October 13, 2005, to MSL and Richard Paese, once again requested a copy of the current rent
roll. In both cases, these requests were ignored.

I now ask, as is my right, that you supply the information requested. My attorney, or his agent,
will contact you on Monday, October 31, 2005, to arrange to pick up copies of a current rent roll as
well as the latest environmental and engineering report.

I require this information in order to exercise my right as a "Sale Refusal Partner", following the
procedures outlined in Section 8 of the Harbor Inn L.P.A. You stated in your letters of September
27, 2005, August 22, 2005 and August 17, 2005, that 55.45% of the partnership interests have
approved your "proposal to sell" resolution and agreement. I have responded, as required, by
announcing my intention to acquire the 55.45% interest of the "sale approving partners".

You have not responded to my letter of October 18, 2005, in which I proposed several options for
settlement of our differences in the sale of Harbor Inn. My proposal was made with guidance from
Larry Bathgate. Larry thereafter informed me that you rejected all offered options. If this is
indeed so, please inform all of the partners as to your decision, and your reasons for doing so. The
55.45% partnership interests will share $14,136,000 (as per your MGPSP) as opposed to my offer
that will give them up to $17,150,000, depending on how much they want to reward MSL with
voluntary fees.

Please respond in a timely manner so that we can proceed.

Sincerely,

Paul Marcus

1

Saddle River, New Jersey 07458-2610

Murray Liebowitz, G.P.
MSL Property Management
2600 East Commercial Boulevard, #200
Fort Lauderdale, Florida 33308

Fax: (954) 491-4504
        (413) 528-6546

Re: Harbor Inn                                                    November 1, 2005

Dear Murray,

I am writing to confirm our telephone conversation yesterday, in which I repeated my request for
access to partnership information for Harbor Inn of C.S. Associates, Ltd., most importantly a
current rent roll, and you stated that you would not provide it without a court order. If I have not
conveyed your statements accurately, please let me know.

Sincerely,

Paul Marcus

Cc: Sheldon Liebowitz
        William Hill

by local rules of court. This form approve...
the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM)

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff   Hillsdale County, NH
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Broward
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

William K. Hill, P.A. - Melissa Pallett Vasquez, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard, Suite 2500, Miami, Florida 33131
Tel: 305-350-7202   Fax: 305-351-2216

Attorneys (If Known)

Broward DT-61750 CIV Code 1578

**(d)** Check County Where Action Arose: ☐ DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government Plaintiff

☐ 3   Federal Question (U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☒ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28USC 1332 and 28USC 1391

LENGTH OF TRIAL via _1_ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE   DIMITROULEAS    DOCKET NUMBER   03-62016-CIV

DATE   11/8/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT $250.00   APPLYING IFP 930146

11/09/05

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.      (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**(d)** County Where Action Arose. Check only one County.

**II.      Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.      Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.      Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.      Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.      Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
                                                      Brief Description: Unauthorized reception of cable service

**VII.      Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.      Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.